KELLY, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–260–CR. Argued June 3, 1976.—Decided January 18, 1977.*
(Also reported in 249 N. W. 2d 800.)

For the plaintiff in error there were briefs and oral argument by *James R. Long* of Appleton.

For the defendant in error the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

DAY, J. The judgment from which a writ of error is taken convicts the defendant, Noreen Kelly, of first-degree murder, sec. 940.01, Stats. The order complained of arises from the decision of the trial court on a number of pretrial motions to suppress evidence (a gun and related items) allegedly seized in violation of Ms. Kelly's fourth amendment right against unreasonable search and seizure. The principal issue is whether the challenged evidence should have been suppressed.

About 6:40 p.m. on August 22, 1973, Alvin Manteufel, age 68, was shot in the back and killed while in his farm home at 1129 E. Fairview Road, Town of Clayton, Winnebago County.

The trial testimony was principally directed to events occurring prior to the murder intended to show a motive on the part of the defendant, Ms. Kelly, for murdering

Alvin Manteufel and events on the day of the murder. There was considerable testimony at the preliminary hearing concerning the activities of the police in locating various items of evidence on August 22nd and August 23rd. This testimony was incorporated into the record on a motion to suppress that evidence along with additional testimony taken at that hearing. At the trial, Robert Manteufel, son of the deceased, testified that Ms. Kelly, a divorcee, had met Alvin Manteufel who had also been divorced early in 1971 and that she moved into the upstairs apartment of his house to become "his private duty nurse." Shortly after this, the deceased purchased an automobile which Ms. Kelly later told Robert was her business automobile to be used in the establishment of a commercial convalescent home in the decedent's house and on his farm property. The deceased, a carpenter by occupation, had begun remodeling his home for this purpose. In October 1971, a power of attorney was executed giving Ms. Kelly control over the decedent's affairs and a joint checking account was established between the two of them. A life insurance policy was taken out on the deceased, the amount of which is not specified in the record but in which Ms. Kelly was named his beneficiary. In November 1971, certain farm machinery belonging to the deceased was auctioned off to raise funds.

Attorney Sidney Mertz testified that the deceased had executed a will in his office on October 27, 1971 in the presence of Ms. Kelly and on the same day executed the power of attorney. The will left his entire estate to Ms. Kelly and the power of attorney gave her control over the decedent's property.

In February 1972, Robert Manteufel returned to Wisconsin from his home in Maryland at the request of his brothers and sisters to investigate the relationship between the decedent and Ms. Kelly. Another son, Raymond, had commenced action with the acquiescence of the deceased to recover his property and control of his

affairs. The action was dismissed later. There was a revocation of the power of attorney which was filed on March 7, 1972, signed by the decedent. On February 11, 1972, the decedent commenced action by the service of a summons and complaint on Ms. Kelly for the return of his automobile, a snowmobile, a social security check and a check from an individual and two policies of hospitalization insurance. Over objection, the county sheriff's department officer who had served the requisition order for return of the property on Ms. Kelly, Leroy Luft, was allowed to testify that Ms. Kelly held him at bay with a rifle for five or ten minutes in an attempt to prevent him from taking the car. She finally surrendered the rifle which turned out to be unloaded.

An assistant cashier at the bank where the deceased did business introduced over objection, bank records concerning the decedent's checking account including the power of attorney to Ms. Kelly.

An employee of the Division of Motor Vehicles testified, over objection, that on February 14th his office had received a document that purported to transfer ownership of the deceased's automobile to Ms. Kelly but because of discrepancies in the application, the title was not transferred.

The sporting goods manager at the Oshkosh K-Mart store testified from store records that a Marlin 30–30 caliber rifle had been sold to Noreen Kelly on November 20, 1971. The son of the deceased, Raymond Manteufel testified that in February, 1972, he had seen this rifle in Ms. Kelly's quarters.

In April of 1972, the decedent went to visit his son, Robert, in Maryland for about a month, came back to Wisconsin and then went to Mexico until April of 1973 and then returned to Wisconsin. Ms. Kelly moved into the downstairs area of the house in August 1973, according to an upstairs tenant.

On August 22nd, the decedent and Ms. Kelly were at Wolff's Inn tavern between 5:30 and 6:00 p.m., according to the proprietress, Virginia Wolff. Ms. Wolff testified that Ms. Kelly's "appearance really struck me . . . her face was kind of puffy and her eyes were so glossy or glary." She testified she had overheard "conversation about she (Ms. Kelly) wanted the title to the car so she could get insurance . . . the (decedent) said he didn't have it, it had been lost."

The upstairs tenant testified that she saw the decedent and Ms. Kelly arrive home at about 6:15 p.m. on August 22nd. She testified she saw and heard nothing else until the gunshot 20 or 30 minutes later, after which she heard the decedent "yelling and moaning," and heard the dog whine. She testified that the Manteufel door was always unlocked, and that she had not overheard any arguments between Manteufel and Ms. Kelly. A neighbor, Josephine Sauer, testified she had seen the decedent come out to get the evening paper at 6:40 p.m. Her husband, Adolph Sauer, had been working in his garden and testified that he had seen no one on or near the Manteufel premises until Noreen Kelly left after the shooting.

Ms. Kelly walked down the road to where a neighbor, Lu Ann McGee, was working on a culvert. Ms. Kelly told her that "a man had been shot" while she was in the bedroom. They went together to the residence of Eugene Biettler who called the Winnebago County Sheriff's Department. Mrs. Biettler testified that Ms. Kelly told her she was in the bathroom when the shooting occurred. At one point Ms. Kelly said the deceased was shot in the back but later she said she saw "how the back of his head was blown off."

Eugene Biettler testified that Ms. Kelly walked along the road "like any other woman would walk on the road" and told him that "her boyfriend had been shot and was running around outside of the house." Ms. McGee

testified that Ms. Kelly "made a big issue about Eugene Biettler not going down there by himself."

Deputy Sheriff, Richard Dehn, arrived at the Manteufel residence at about 6:55 p.m. in response to a radio message. After a survey of the premises and outbuildings, he discovered the deceased's body on the kitchen floor two or three steps away from the kitchen table. A newspaper was spread on the table which also showed a bullet hole. While he was there, the body was removed. Officer James Vanderlois of the Menasha Police Department arrived shortly after Mr. Dehn, and was told by Mr. Dehn that he thought a murder had occurred and that Ms. Kelly had committed it based on "past calls that we had had out there, and knowing there was differences between them." Mr. Dehn instructed Mr. Vanderlois to make sure no unauthorized persons entered the house. Ms. Kelly did not return to the Manteufel house but was taken into custody at the Biettler's shortly after the police arrived. The deceased was taken to the hospital by ambulance and he was pronounced dead at 7:25 p.m. It took about 15 minutes to go from his home to the hospital. Mr. Vanderlois testified that Mr. Dehn had instructed him to search the surrounding premises for a gun but he did not find a gun. Detective Meyer told him to make a complete search inside the house, which he did without results. Mr. Vanderlois then went back outside to check the surrounding fields with about four private citizens and found a rifle under the Manteufel porch. He stated he crawled under the front porch and found it lying against the wall on a piece of lumber. He testified he first saw it about 8:25 p.m. while he was lying down on his stomach under the porch with a flashlight and stated that even if it had been light outdoors, the gun would not have been visible "unless you are right on top of it." Measurements taken showed that the gun was 20 inches in from the front of the porch and 36 inches from the corner of the house. Officer Roger Koepp of the sheriff's de-

partment arrived to assist Mr. Dehn and along with Mr. Vanderlois searched the downstairs apartment about 25 minutes after his arrival and after the body had been removed. They found nothing unusual. Officer Koepp stated he was looking for a weapon, and there is "always a fear" that someone might be hiding in the house. About 45 minutes after his arrival, Detective Meyer found a spent rifle slug on the kitchen floor. He removed the rifle found by Mr. Vanderlois, identified it as a Marlin 30–30 bearing the same serial number as the one Ms. Kelly had purchased in 1971 at the K-Mart. Mr. Meyer gave as his opinion that from the position of the rifle, it had been placed there rather than thrown.

On the following afternoon Lieutenant Wilbur Fuller of the Winnebago County Sheriff's Department visited the Manteufel residence in the company of Sgt. Neil Cowling and a member of the district attorney's staff. The house had been guarded all night. At the hearing on suppression of evidence, Mr. Fuller testified that Raymond Manteufel, Dale Manteufel and a son-in-law, Warren Zemloch, were present when he went to the house, waiting to get inside. When asked if they had objected to his entering the premises, Mr. Fuller's statement was, "it was quite the opposite." Police offficials checked the house and discovered a gun case and a box of 30–30 ammunition on a shelf in the closet of the bedroom that Ms. Kelly had occupied. There was a suitcase partially packed with her clothes.

A firearms specialist from the State Crime Laboratory testified that the slug found on the kitchen floor was "consistent with" those in the box of shells found in Ms. Kelly's closet and that it had the same characteristics as others that he had fired from the gun. Inside the gun, he had found a cartridge case which had been fired in that gun and which was identical to those in the box of shells.

On August 22nd, the day of the murder, the officers found a rifle under the porch and a slug on the kitchen floor. The defendant claims admission into evidence of these items, including the empty cartridge found in the rifle, violated her right under the fourth amendment against unreasonable searches.

The trial court, both at the hearing on the suppression of evidence and in motions after verdict, found two grounds for admitting these items. First, the court found that the defendant, having requested the neighbors to call the police and having furnished the police with the description of the deceased as "running around outside, shot," thereby gave permission for the search. Secondly, the court found the rifle was "in plain view" and could be seized and that the slug on the kitchen floor was likewise "in plain view" and the proper subject for seizure by the authorities.

A review of the time sequence shows that at 6:55 p.m. Sergeant Dehn arrived at the scene. By 7:10 p.m., the deceased's body was removed from the scene. At 7:21 p.m., Detective Meyer arrived and at 8:05 p.m., he found the slug on the kitchen floor. At 8:25 p.m., Officer Vanderlois discovered the rifle under the porch.

■ A search may be made without a warrant if made with consent.[1] The trial court found that the defendant had consented to the search stating:

"I think that the key in this case is that here the defendant herself initiated the investigation which led to the search. Officer Dehn responded to a radio call, the other officers appear on the scene and they were all present and remained on the premises. They were aware that a shooting had taken place, they were not aware as to who had done it and were there to find out, first

---

[1] "968.10, Stats., *Searches and seizures; when authorized.* A search of a person, object or place may be made and things may be seized when the search is made: . . . .

"(2) With consent. . . ."

of all, what had happened . . . . The defendant herself consented to the search, the reason being that she initiated the investigation leading to the search . . . ."

Officer Dehn testified that he was under the impression when he answered the call that the deceased "has a self-inflicted gunshot wound . . . I assume that he is running around wild . . . I am looking for a man that is maybe in a crazed condition . . . wounded and maybe stark-raving mad . . . ."

 The defendant had given the information that the deceased was running around outside shot. She told one neighbor that she was in the bathroom and another that she was in the bedroom when she heard the shot, the only implication being that certainly she was not the one that had inflicted the wound. The testimony shows that the officer who arrived at the scene first inspected the outbuildings and the grounds surrounding the house. We hold that the finding of the trial court that under all these facts and circumstances the defendant had given her consent to a search of the premises that resulted in the gun, the shell within the gun and the slug on the floor being discovered is not against the great weight and clear preponderance of the evidence and we sustain this finding of the trial court.

The standard for review of a suppression hearing is whether findings of the trial court are against the great weight and clear preponderance of the evidence. *State v. Pires,* 55 Wis.2d 597, 603, 201 N.W.2d 153 (1972).

The defendant relies on *Pires,* which excluded inculpatory evidence found in the bedroom of the defendant in the form of statements written by the defendant on a note pad. In *Pires* the defendant's husband had come home from work, went to the bedroom and found his wife unconscious on the bed along with their infant child who was cold and apparently dead. He testified that he

thought that the child had died in a fall and that his wife had had a nervous breakdown. As a result, he first called her psychiatrist, next called his brother and then called the police ambulance. He rode in the police ambulance with his wife and child to the hospital. The call for the ambulance was also noted by a detective in the police department who proceeded to the residence not knowing that the police ambulance had already been there and removed the woman and her child. The detective met other officers who drove up on the scene; they went to the front door and found it locked. They went to the back door and when they found it was open they immediately started to search the house for the victims. They went to the bedroom and concluded that the victims had been removed. Later they made a second trip into the bedroom where they found a clipboard with the pad attached that had several pages apparently written by the defendant mother. The trial court suppressed the evidence at trial as being violative of the fourth amendment rights of the defendant and this court sustained that suppression. This court held that the "exigent circumstances" rule only applied to the detective's response in entering the house looking for the victims and that once the victims had been taken away the police then should have sealed off the house from entry and sought a warrant. The court also discussed the theory that the husband had given consent to the search. The court said:

"Under the circumstances present in this case, when a man comes home from work and finds his wife and infant child in the condition of these victims, it cannot be said that the telephone call to the police ambulance for emergency service constituted consent, either before or after the emergency service has been afforded, to an unlimited warrantless search of his dwelling . . . ." 55 Wis.2d 609.

*Pires* is distinguishable from this case because here it was the defendant herself who called the police and under

circumstances that implied that the victim had shot himself or had been shot by someone other than the defendant and was running around outside. Under such circumstances there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible. Looking for the gun on the grounds surrounding the house and under the porch constituted a reasonable search under the consent given. Finding the bullet on the kitchen floor was likewise a seizure of evidence made within a reasonable time following the implied consent. In *Pires* it was clear that the consent to enter the residence was given by the husband to the police ambulance crew solely to get the victims to the hospital. The exigent circumstances justifying the entry by the detective the first time was receipt of information that there were victims in the home. The presence of the detective in the bedroom in *Pires* was justified not on the basis of consent by the husband but by the necessity of looking for the victims. In the case before us the presence of the officers was by the implied consent of the defendant, not only to help the victim but to investigate. In *Pires* the consent was limited to the consent by the husband to the ambulance personnel to take his wife and child to the hospital. There was no consent to carry out an investigation.

On August 23, officers, accompanied by two sons of the deceased and a son-in-law, again entered the premises. They conducted a further search and found a rifle case and a box of 30–30 caliber shells on a shelf in a closet in the defendant's bedroom. The defendant objected that these items were improperly seized without a warrant. The court correctly concluded that any consent to search given by the defendant the day before would not carry over to the next day. However the trial court found that the entry by the police was made with the consent of the children of the deceased and that therefore the police had a right to rely on such consent and to make the search.

The theory of consent is based on a statement by officer Wilbur Fuller that the Manteufel children did not object to his entry. He said, "the indication was quite the opposite." The Manteufel children had been waiting to get into the house when the police arrived. The defendant argues that this hardly constituted consent. We hold that even if consent by the deceased's children is assumed, they had no authority to permit a search.

Under the United States Supreme Court's decision in *United States v. Matlock,* 415 U.S. 164, 94 Sup. Ct. 988, 39 L. Ed.2d 242 (1974), neither the deceased's sons nor son-in-law had authority to consent to a search of the defendant's bedroom, especially when it was located in a house in which they did not reside and over which they claimed no possessory rights whatsoever. In *Matlock,* the Supreme Court reversed a 7th Circuit decision excluding evidence obtained in a search of a room which defendant had rented in the home of another family. The search had been consented to by a daughter of the family who said she was occupying the rented room with the defendant. The principal question in *Matlock* was the admissibility of evidence at the suppression hearing, and the case was remanded for reconsideration in light of newly admissible evidence that the consenting daughter also occupied the rented bedroom, and therefore had authority to consent to a search. The court noted that consent to search could be obtained from a "third party who possessed common authority over or other sufficient relationship to the premises . . ." 415 U.S. at 171. In a footnote, the court amplified the principle of "common authority":

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States,* 365 U.S. 610 (1961) (landlord could

not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

In *Stoner v. California, supra,* the court had emphasized that authority to consent to search does not depend on legal property rights, but rather on the relationship in fact of the consenting party to the searched premises. 376 U.S. at 488:

". . . Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.' As this Court has said, ' "it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . . (W)e ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime." ' *Jones v. United States,* 362 U.S. 257, 266–267."

█ Several post-*Matlock* cases have reiterated and interpreted the standard of "joint access and control" set forth there.[2] The state has not cited, nor have we found

---

[2] Some of the recent federal appellate decisions: *U. S. v. Turbyfill* (8th Cir. 1975), 525 F.2d 57 ("occupant of indefinite duration rather than a casual visitor" may consent to search); *U. S. v. Long* (9th Cir. 1975), 524 F.2d 660 (estranged wife who is joint owner of house may consent to search); *U. S. v. Green* (9th Cir. 1975), 523 F.2d 968 (employee with key to premises,

any cases holding that a nonresident of the premises, merely by virtue of being a relative of the property owner, has authority to consent to a search.

The state argues that the officers investigating the Alvin Manteufel death might have reasonably believed that his children could validly consent to the search; i.e., that the children did have the right of "joint access and control" of the premises. Nothing in the record supports this argument. There is no evidence that Raymond or Dale Manteufel, or Warren Zemlock, had ever lived on the premises or owned any part thereof, or that the police had any basis whatsoever for assuming that these people had any rights on the property. "Consent to a search is not to be lightly inferred, but should be shown by clear and convincing evidence." *Phelper v. Decker* (5th Cir. 1968), 401 F.2d 232, 236, quoted in *Moffett v. Wainwright* (5th Cir. 1975), 512 F.2d 496, 499. *Moffett* held that "consent" by three women who had stated to police that they lived on the defendant's premises was not effective where there was no evidence at trial of their rights to be on the premises. The burden is on the state to establish the basis of a "consent" search.

The evidence failed to show that on August 23rd any of those relatives named had "joint access to or control" over Alvin Manteufel's home such as to empower them to consent to a search of the premises at all. It must be concluded that the search of the defendant's bedroom was unconstitutional and that the fruits of such search, the gun case and the box of shells, should have been excluded.

█ However we find that the admission of this evidence constituted harmless error in this case. We conclude

who held lease in his own name, and personally used premises could validly consent to search); *U. S. v. Novello* (5th Cir. 1975), 519 F.2d 1078 (no "reasonable expectation of privacy" is justified where defendant's co-tenant had key to his rented warehouse space).

from examination of this record that the evidence of the defendant's guilt was such that without this evidence and uninfluenced by it that the admissible evidence was such as would allow the jury to convict the defendant beyond a reasonable doubt. As this court said in *Wold v. State,* 57 Wis.2d 344, 356, 204 N.W.2d 482 (1973) :

"The test of harmless error is not whether some harm has resulted, but rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt."

We conclude in our independent determination that the other evidence uninfluenced by the inadmissible evidence is sufficient to convict the defendant beyond a reasonable doubt.[3]

The other testimony and evidence which was admitted concerned the motive of the defendant for taking the deceased's life. The defense argues that the testimony of Robert Manteufel, Sidney Mertz, Sgt. Luft, Patricia Glatz and Dean Davis, all tending to show Ms. Kelly's motives for killing Alvin Manteufel, should have been excluded as irrelevant. The testimony of Sgt. Luft regarding Ms. Kelly's resistance to recovery and repos-

---

[3] We decline to upset *Wold* in favor of *Kotteakos v. United States,* 328 U.S. 750, 764, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946), which states the formulation of the harmless error rule advocated by the concurring member of this court. *Kotteakos* was recently mentioned in *United States v. Agurs,* 427 U.S. 97, 49 L. Ed2d 342, 96 S. Ct. 2392 (1976). Reference to *Kotteakos* in *Agurs* was not essential to the determination of *Agurs. Wold* relied upon United States Supreme Court statements of the federal harmless error rule which are more recent than *Kotteakos;* see, 57 Wis.2d at 356, 357. The *Kotteakos* standard was not raised or argued by the parties. However, it is our opinion the improperly admitted evidence had "but only slight effect," *Kotteakos,* 328 U.S. at 764 and the result in this case would be the same under that test.

session of the car and Dean Davis' testimony concerning the attempt to transfer title raises the question as to whether or not this evidence is so prejudicial as to require exclusion under sec. 904.03, Stats.,[4] even if it is otherwise admissible to prove motive under sec. 904.04 (2), Stats.[5] Generally, evidence of motive should be admissible under the same standards of relevancy as other evidence. Sec 904.01–02 Stats.[6] The evidence of motive offered in the present case was clearly relevant insofar as it tended to increase the probability of Ms. Kelly's guilt. The real question is whether its prejudicial effect outweighed its probative value under sec. 904.03, Stats., *supra.* The testimony of Robert Manteufel, Sidney Mertz and Patricia Glatz concerning Alvin Manteufel's financial relationship with the defendant is not "prejudicial" in the sense of suggesting a propensity to commit first-degree murder; it did suggest the background relation-

[4] "904.03 *Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.* Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[5] "904.04 (2) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. The subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[6] "904.01. *Definition of 'relevant evidence'.* 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"904.02. *Relevant evidence generally admissible; Irrelevant evidence inadmissible.* All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible."

ship of the parties. It particularly showed the relationship these parties had at a financial level and in this respect the evidence as to the execution of the will and the power of attorney were properly admissible.

The testimony of Sgt. Luft concerning his encounter with Ms. Kelly wherein she held him off with a rifle when he attempted to repossess the car shows possession and control of a rifle by defendant and the testimony of Dean Davis respecting the attempted change of title to the automobile went to her desire to acquire deceased's property. This court has required the trial court to exercise discretion in weighing the probative value of evidence against its prejudicial effect. *Whitty v. State,* 34 Wis.2d 278, 149 N.W.2d 557 (1967) ; *State v. Hutnik,* 39 Wis.2d 754, 763, 159 N.W.2d 733; *State v. Kuta,* 68 Wis.2d 641, 644, 229 N.W.2d 580 (1975). The record here shows that the trial court entertained lengthy arguments concerning the evidence of certain checks allegedly altered by Ms. Kelly. The court here definitely exercised its discretion in admitting this testimony and we do not find that there was any abuse of the court's discretion.

Defendant argues that a jury cannot consider motive evidence in determining guilt or innocence; this is equivalent to an argument that all motive evidence is irrelevant and excludable. The authority cited is *State v. Janasky,* 258 Wis. 182, 183, 45 N.W.2d 78 (1950), where this court said:

"After stating that there were two essential elements to be proven within reasonable probabilities in this case, first, that the fire was of incendiary origin and, second, that there is probable cause to believe that the defendants, or either of them, set it, the trial court then stated as follows:

" 'There is sufficient evidence in my opinion to show that the defendants had an opportunity to set the fire and that they had a motive for setting it.'

"Whether or not the presence or absence of motive is material is stated as follows in 1 Wharton, Criminal Evidence (11th ed.), p. 288, sec. 246:

" 'The presence or absence of motive in cases depending wholly on circumstantial evidence is not a factor that determines either the guilt or the innocence of the accused. Proof of motive does not establish guilt, nor want of it establish innocence, . . .'

"It follows that the only question presented at this time is whether the state offered sufficient evidence to show within reasonable probabilities that the fire was of incendiary origin."

*Janasky* did not exclude the motive evidence offered on the basis of irrelevancy or for any other reason. It merely observed, in the context of criticism of the trial judge's comments, that motive is not an element of crime, and thus cannot determine guilt or innocence. This is precisely the import of the standard jury instruction which the court gave.[7]

The defense argues that there is insufficient evidence to convict the defendant and that the evidence of the defendant's guilt is circumstantial. It is true that the evidence here was circumstantial but as this court has said, "a criminal conviction can stand based in whole or in part upon circumstantial evidence." *Bautista v. State,* 53 Wis.2d 218, 223, 191 N.W.2d 725 (1971).

We conclude from an examination of the record that there was sufficient evidence for the jury to find the defendant guilty beyond a reasonable doubt.

*By the Court.*—Judgment and order affirmed.

---

[7] Proof of motive to commit a crime is not essential or indispensable to a conviction. While motive may be shown as a circumstance to aid in establishing the guilt of a defendant, the State is not required to prove motive on the part of a defendant in order to convict him. Mere proof of motive, on the other hand, does not of itself establish guilt. The presence or absence of motive in any case is but a mere evidentiary circumstance, to be given just such weight by the jury as you deem the same entitled to, under all the circumstances.

HEFFERNAN, J. (concurring) This writer doubts the correctness of the formulation of the harmless error rule in *Wold* relied upon in the majority opinion. Under that rule no error can be prejudicial if the evidence properly admitted is highly probative of guilt. This is an invitation for prosecutorial abuse. There is always a temptation for a prosecutor to make a good case better by urging admission of dubious or improper evidence. The *Wold* rule gives no recourse against errors which may well have a substantial impact upon the jury's finding of guilt. The philosophy of *Wold* is simply that a person who may properly be found guilty under admissible evidence cannot be deprived of a fair trial because of error, even though that error contributes substantially to the finding of guilt. *Wold,* erroneously I believe, places the emphasis upon the admissible evidence rather than upon the alleged error. Attention should be focused on whether the error prejudices the rights of the defendant.

When *Agurs,* 427 U.S. 97, 49 L. Ed.2d 342, 96 S. Ct. 2392 (1976), refers to the usual harmless error rule as being such that, ". . . when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his 'conviction is sure that the error did not influence the jury, or had but only slight effect' . . ." (427 U.S. at 112, 49 L. Ed. at 354), it is clear that the United States Supreme Court speaks of a rule different than that adopted in *Wold.*

While there are opinions of the United States Supreme Court that appear to support the *Wold* analysis, *Agurs,* arguably at least, indicates a withdrawal from those cases.

In any event it is the opinion of this writer that in an appropriate case the *Wold* rule should be reconsidered in light of *Agurs* and in light of the obvious overbreadth of the rule. In view of the majority's conclusion that the

error would in this case, under either test, be harmless, I concur in the result.

ABRAHAMSON, J., took no part.