STATE of Wisconsin, Plaintiff-Respondent,

v.

Glen J. GOEBEL, Defendant-Appellant-Petitioner.

Supreme Court

*No. 80–129–CR. Argued June 2, 1981.—Decided July 6, 1981.*

(Also reported in 307 N.W.2d 915.)

For the petitioner there were briefs and oral argument by *Donna L. Hintze,* assistant state public defender.

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Pamela Magee-Heilprin,* assistant attorney general, and oral argument by *Kirbie Knutson,* assistant attorney general.

DAY, J.   This is a review of an unpublished decision of the court of appeals dated October 15, 1980, which affirmed an order and judgment of the circuit court for Ozaukee county, WALTER J. SWIETLIK, Circuit Judge. The primary question presented on review is: Did the activities of the police under the circumstances of this case, violate the defendant's Fourth Amendment right to be free from unreasonable searches and seizures? We hold that the defendant's rights were not violated and affirm.

On October 18, 1978, the defendant, Glen J. Goebel, was charged in a criminal complaint with possession of a controlled substance, (marijuana) with intent to deliver, contrary to sec. 161.41(1m), Stats. 1977.[1]

Following a preliminary hearing, the defendant was bound over for trial.  The defendant, by his counsel,

---

[1] "161.41.  **Prohibited acts A—penalties** . . . . (1m) Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture or deliver, a controlled substance. Intent under this subsection may be demonstrated by, without limitation because of enumeration, evidence of the quantity and monetary value of the substances possessed, the possession of manufacturing implements or paraphernalia, and the activities or statements of the person in possession of the controlled substance prior to and after the alleged violation. Any person who violates this subsection with respect to: . . . (b) Any other controlled substance classified in schedule I, II or III, may be fined not more than $15,000 or imprisoned not more than 5 years or both; . . ."

moved the trial court to dismiss the complaint on the ground that the complaint was based on an illegal arrest, thereby depriving the court of personal jurisdiction. He also moved to suppress certain evidence arguing that it had been obtained by an illegal search. A hearing on the motions was held on May 10, May 30 and July 6, 1979. The trial court, in a memorandum decision, dated July 19, 1979, denied the motions.

On July 27, 1979, the defendant changed his plea from not guilty to no contest. A judgment of conviction was entered on October 10, 1979. The defendant was given a two-year sentence, which was stayed and the defendant was placed on probation for two years and ordered to pay a fine of $3,000. The court ordered half of the fine to be paid before the end of the first year of probation and the remainder before the end of the probation. The defendant later moved the court to amend the sentence, arguing that the fine imposed was beyond his ability to pay. The court did change the probation order to permit payment of the fine at any time during the term of probation, but did not change the amount of the fine. An amended judgment of conviction was entered on January 8, 1980.

The defendant appealed from the judgment of conviction and the order modifying his sentence. The court of appeals affirmed both the order and the conviction. This court granted defendant's petition to review.[2]

---

[2] This court also reviews the trial court order denying defendant's motion to suppress evidence, pursuant to sec. 971.31(10), Stats. (1979):

"971.31. **Motions before trial.** (1) Any motion which is capable of determination without the trial of the general issue may be made before trial. . . . (10) An order denying a motion to suppress evidence or a motion challenging the admissibility of a statement of a defendant may be reviewed upon appeal from a judgment of conviction notwithstanding the fact that such judgment was entered upon a plea of guilty."

This prosecution arose from events in the early evening hours of October 17, 1978. At approximately 6:16 p.m. on that day, Officer Dennis Burch of the Mequon police department was on patrol on Lake Shore Drive in the city of Mequon. According to his testimony he was proceeding south on Lake Shore Drive when he observed a yellow Ford automobile parked on the west side of the road. The vehicle was partially on the roadway and partially on the shoulder of the road. As Burch pulled up behind the vehicle he observed two occupants in the car. He saw the passenger "leaning over to the left, as if he were putting something under the seat or possibly taking something out, making kind of a quick motion." Burch got out of his squad car and walked up to the yellow Ford. The driver of the yellow Ford then got out of his car and quickly walked toward Burch, meeting the officer at the rear of the Ford. Burch asked the driver, the defendant, whether he was having any problems. The defendant responded that he had carburetor trouble and his car wasn't getting any gas, but that he could get the car going. Burch stated the defendant "appeared to be very nervous, wanting to leave the area very quickly." The defendant testified he told Burch he had a problem with his fuel filter but that he "could probably start it after letting it sit for a short time."

Burch then asked the defendant for his driver's license and returned to his squad car. He then radioed for a backup officer because he considered "the parties were very suspicious, his actions were very suspicious, and I felt I would want a backup." He also ran a "check" on the defendant's driver's license and license plate. Before he got a response from the check, Burch again walked to defendant's car. The defendant again met him at the rear of his car. Burch then told defendant that he wanted to "get the passenger's information, such as his name,

date of birth." The defendant walked with Burch to the driver's side door and, according to Burch "turned his back toward the window and was obstructing my view from looking into the vehicle to get information from the passenger." Burch then leaned into the driver's side car window to get information from the passenger. The passenger, Vincent Di Mayo, then slid across the front seat and got out of the driver's side door of defendant's car. Burch took Mr. Di Mayo's information and identification and returned to his squad car to run a check on Di Mayo. Burch waited in his car for the "check" and for the backup he had requested earlier. Burch did not recall receiving any response to the "check."

The backup officer, Mario Valdes, arrived about ten minutes later. Valdes, on Burch's radioed advice, pulled up his squad car and parked it one and one-half to two feet in front of defendant's car.

Burch then approached defendant's car for a third time, this time with Valdes approaching the car on the passenger side. The defendant again met Burch at the rear of his car. Burch then asked the defendant "what was being put underneath the seat in the car as [he] pulled up to them." Defendant said, "I'll show you what we put under the seat." The defendant then returned to his car and pulled a McDonald's restaurant bag from under the seat. At this point Officer Valdes was standing on the passenger side of the car looking in. Defendant then pulled a second McDonald's bag from under the passenger seat. The defendant testified that as he reached for a third McDonald's bag he pulled out a small plastic bag of marijuana. He stated that he dropped that bag and pulled out another McDonald's bag instead. He testified that he may have attempted to put the marijuana bag back under the seat, but was not certain whether he had. Officer Valdes observed the bag of mari-

juana when it was exposed by the defendant. Valdes testified that the plastic bag contained a green vegetable material which he recognized as marijuana. Valdes informed Burch that he had seen the contraband.

Both defendants were then formally placed under arrest and put in separate squad cars. Officers Burch and Valdes then searched defendant's car and found additional bags of marijuana.

The defendant does not allege any impropriety in Officer Burch's original contact with the defendant, wherein he inquired whether defendant was having car trouble. Contacts of this sort are not only authorized, but constitute an important duty of law enforcement officers. In this case Officer Burch did ask the defendant if he had a car problem and the defendant said that he did, but could remedy the problem alone. This explanation did not satisfy the officer, because he considered the defendant's nervous manner and the "furtive gesture" of Di Mayo in leaning to his left and reaching under the car seat to be suspicious for reasons he detailed at the suppression hearing.

The defendant, however, argues that the officer had no basis for detaining him for further investigation.

In *Terry v. Ohio,* 392 U.S. 1, 22 (1968), the Supreme Court of the United States held that ". . . a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The court in *Terry* recognized that a brief investigatory stop is a "seizure" and is therefore subject to the reasonableness requirement of the Fourth Amendment. The standard established by the court, which has been repeatedly adhered to, requires that the police officer:

". . . must be able to point to specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant that intrusion." *Terry, supra,* 392 U.S. at 21.

The facts must be judged against an objective standard, that is:

". . . would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry, supra,* 392 U.S. at 21-22.

The Wisconsin legislature has codified the *Terry* standard for a temporary stop in sec. 968.24, Stats., which provides:

"968.24. **Temporary questioning without arrest.** After having identified himself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of his conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped."

The trial court relied on this section in finding that "the temporary detention and questioning of the defendants was not in violation of their constitutional rights."

The court of appeals found that the record amply supported that conclusion. We agree. Because of the Fourth Amendment questions presented, ". . . this court will independently examine the circumstances of the case to determine whether the constitutional rquirement of reasonableness is satisfied." *Bies v. State,* 76 Wis.2d 457, 469, 251 N.W.2d 461 (1977).

When Officer Burch approached the defendant's car, it was parked partially on the road. As he pulled up behind the car, he observed the passenger make a move-

ment as if he was putting something under the seat of his car. The passenger, Di Mayo, testified that before Burch drove up, he pushed a bag of marijuana under the seat with his foot, and that when Burch drove up he merely turned around to look at the approaching squad car. As soon as the officer got out of his car and approached the defendant's car, the defendant hurriedly walked back to meet the officer. The officer observed that the defendant was very nervous and anxious to leave.

It is true that many innocent citizens may become nervous and appear uncomfortable when approached by a police officer. It is also true that Di Mayo's placing something under the seat could be entirely consistent with innocent behavior. But Officer Burch, who had served more than three years on the Mequon police force, had further reason to suspect that criminal conduct may have occurred. When asked at the suppression hearing what crime he suspected the defendant and Di Mayo had committed, he stated:

". . . it might have been possibly a burglary. Many times in the past I have pulled up behind vehicles and these things are being put underneath the seat or parties are trying to get rid of things. . . .

"The area is rather open but there are a few houses that are in the area and, as I stated, there had been burglaries out in that area before. . . .

"Approximately a month prior to [this incident] there was a burglary, two burglaries at the same residence, just approximately a quarter mile away, a quarter mile south of where they were."[3]

---

[3] The extensive quotations from officer Burch's testimony included in Justice Abrahamson's dissenting opinion do not show a smooth and articulate presentation of ideas. But the constitutionality of police actions do not turn on rhetorical skills. The standard requires facts that are "specific and articulable," it does not depend on facts that are presented with the articulate precision of a polished speaker. Burch's testimony referred to specific facts which

Although these facts do not rise to the level of probable cause, the absence of probable cause to arrest:

". . . does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. [Citation omitted]. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time." *Adams v. Williams,* 407 U.S. 143, 145–146 (1972).

■

Aware as he was of the suspicious actions of the defendant and his passenger, and of the incidents of burglary in the immediate vicinity, Officer Burch acted reasonably in detaining the defendant for the short period of time to obtain more information. As the Second Circuit Court of Appeals has observed: ". . . the right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *United States v. Oates,* 560 F.2d 45, 63 (2d Cir. 1977). Indeed, without the authority to question a suspect about his identity and the nature of his suspicious activity, a *Terry* stop would be a futile exercise. This is recognized in sec. 968.24, Stats., which authorizes a law enforcement officer to "demand the name and address of the person and an explanation of his conduct."

The defendant argues that even if Officer Burch had reasonable suspicion to justify detaining him long enough to establish his identity and an explanation of

aroused his reasonable suspicion—the location of the vehicle; the passenger's furtive movement; the extreme nervousness of the defendant and his attempts to prevent the officer from approaching the car; and the incidents of burglary in the neighborhood.

his presence in the area, his continued detention was an arrest for which probable cause must be shown. The defendant cites *Dunaway v. New York,* 442 U.S. 200, 212 (1979), for the proposition that formal words of arrest or "booking" procedure are not necessary to bring into play the Fourth Amendment requirement of probable cause to arrest.

In *Dunaway* the defendant had been picked up by police at a neighbor's house and taken to police headquarters. There he was placed in an interrogation room where he was given *Miranda* warnings and subjected to questioning. He was not told that he was under arrest, but it was clear that he was in custody and would have been physically restrained if he attempted to leave. The defendant made statements and drew sketches that were incriminating. He was then charged with attempted robbery and felony murder. He moved to suppress the statements and sketches, arguing he had been arrested without probable cause. The United States Supreme Court reversed his conviction, finding that his detention was ". . . in important respects indistinguishable from a traditional arrest." *Dunaway, supra,* 442 U.S. at 212.

Of course the police actions in the instant case are vastly less intrusive than the custodial interrogation involved in *Dunaway.* As the defendant concedes, "[w]hether an arrest requiring probable cause has occurred depends on the facts and circumstances of each case." In the instant case, Officer Burch was authorized by his reasonable suspicion to detain the defendant long enough to establish his identity and an explanation of his suspicious conduct. From the time he arrived at about 6:16 p.m., until Officer Valdes arrived at the scene at about 6:25 p.m., Burch ran appropriate checks to establish the identities of the occupants of the car and to confirm that neither was wanted by the authorities.

This intrusion, lasting less than ten minutes according to the officers, falls far short of traditional arrest or the nontechnical arrest involved in *Dunaway*. We hold that this brief investigative detention did not amount to an arrest of the defendant.

Our conclusion is consistent with this court's cases on when arrest occurs. In *State v. Doyle*, 96 Wis.2d 272, 291 N.W.2d 545 (1980), this court found three elements necessary to conclude a person is under arrest: "(1) his ability or freedom of movement is restricted, (2) the arresting officer intends, at that time, to restrain the person, and (3) the person under arrest believes or understands he is in custody." *Doyle, supra*, 96 Wis.2d at 282. In *Doyle*, a warning ticket was issued to the defendants and they were told to "wait here." They were so detained for about one-half hour, while the police waited for further information from a witness.

Although the defendant in this case was restrained, we do not believe the officer intended to take him into custody before the marijuana was discovered. As the *Doyle* court recognized:

"The United States Supreme Court has distinguished arrest from stopping to question a suspect, terming arrest 'a wholly different kind of intrusion upon individual freedom than a limited search for weapons,' with the 'interests each is designed to serve . . . likewise quite different.' *An arrest, the high court stated, is 'inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows.'* . . . Obviously, stopping a suspect to question him—and to frisk him for weapons—does not involve such certainty of continued or future restraint. It may, but not necessarily so." *Doyle, supra*, 96 Wis.2d at 283, (quoting *State v. Beaty*, 57 Wis.2d 531, 537, 205 N.W.2d 11 (1973). (Emphasis in original.)

Although Officer Burch did briefly detain the defendant to establish his identity, some brief and involuntary

detention is involved with any "stop-and-frisk" or "stop-and-question" situation. But the record in this case does not establish that Burch intended to restrain the defendant beyond establishing his identity and seeking some explanation of his and his passenger's conduct. After he completed his check on the identification of the parties he did nothing more than ask the defendant what his passenger had placed under the seat. This brief on-the-spot detention did not amount to an arrest requiring probable cause.

We therefore conclude that the defendant's brief detention did not violate his Fourth Amendment right to be free of unreasonable seizures, but was a justified stop supported by the officer's reasonable suspicion aroused by the defendant's and passenger's conduct.[4]

---

[4] *Michigan v. Summers,* —— U.S. ——, 101 S. Ct. 2587, 2593, 69 L. Ed. 2d 340 (1981).

". . . the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*.[12]

---

[12] "Justice White, concurring in Dunaway, noted that *Terry* is not 'an almost unique exception to a hard-and-fast standard of probable cause.' Rather, 'the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests.' 442 U.S. at 219 (White, J., concurring). If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams*. As one commentator observed:

" 'It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve

The next questions involve the admissibility of "baggies" of marijuana found in defendant's car.

The defendant challenges admissibility of the "baggie" of marijuana that came from under the passenger's seat. Officer Burch asked the defendant what had been placed under the seat. The defendant said he replied: "There is nothing under my seat." Officer Burch then said he saw the passenger put something under the seat and asked what it was. Defendant answered: "I will show you what is under the seat" and proceeded to remove McDonald's restaurant bags from under the seat and placed them outside the car. The defendant's pulling out the McDonald bags from under the seat was a voluntary act. At the suppression hearing the defendant described how the "baggies" of marijuana came to be exposed to view:

"At the third time I had also touched a bag. I hadn't brought it out of the car. But I also pulled out another bag other than the McDonald bag. . . . I pulled that bag out and I was surprised. That's how I'm going to tell it. I looked at it and I didn't know what was there at first; then, I looked at it and I was surprised. I dropped the bag on the hump of my car and . . . I left it there. . . . I didn't bring it outside of the car."

This was a voluntary act on the part of the defendant that exposed the contraband to the officers and justified its seizure. It likewise gave the officers probable cause to arrest the defendants, which they promptly did. It seems obvious that defendant only intended to pull

checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale.' 3 W. LaFave, Search and Seizure §9.2., pp. 36–37 (1978)."

out the McDonald bags from under the car seat. He hoped thereby to convince the officer that only refuse had been placed under the seat. But that does not render his action involuntary merely because he inadvertently exposed the contraband. From the appearance of the material in the "baggie," Officer Valdes had reasonable cause to believe it was contraband and to place the defendant and Di Mayo under arrest.

We conclude that the seizure of the first bag of marijuana was justified because it was voluntarily revealed by the defendant. It was so produced during a justified investigatory stop.

The defendant next argues that the warrantless search of his car after his arrest violated his Fourth Amendment rights, requiring suppression of the additional marijuana found in that search.

At the time of the arrest the defendant and Di Mayo were searched. The defendant had about $144 on his person. Di Mayo was found to have about $1,500 in cash in large bills and a small quantity of marijuana. At the suppression hearing the defendant testified he told officer Burch that his passenger's name was Vince but that he didn't know the passenger's last name.

We agree with the statement by the court of appeals: "The large amounts of money and additional marijuana found during the search would lead a reasonable police officer to suspect the occupants of the car were more than mere possessors of marijuana."

The officers therefore had probable cause to search the car. As this court stated in *State v. Russell,* 60 Wis.2d 712, 718, 211 N.W.2d 637 (1973):

"The search of the vehicle in this case was based upon facts known to the officer which would lead any reasonable police officer to believe that it was not only probable, but highly probable, that the fruits of the crime

were near at hand. The search described above was reasonable police activity—not an unreasonable search nor deprivation of privacy as prohibited by both the federal and state constitutions."

■

The defendants were each placed in separate squad cars. The officers then proceeded to search the defendant's car and found several bags of marijuana in the back seat.

The search of the car was a search incident to the arrest. The defendants need not be in the vehicle or close by to validate such a search. The defendant's car was in police custody and one of the officers testified he called a towing truck to remove it:

"When the occupants of a vehicle have been arrested and the vehicle is in police custody, the Supreme Court has clearly held that the vehicle may be searched, even though the exigencies that may have existed at the time of arrest no longer apply when the vehicle is in custody. *Chambers v. Maroney,* 399 U.S. 42 (1970). The Court found no difference for constitutional purposes between seizing the vehicle, then holding it until a warrant could be obtained, and searching it later without a warrant. As long as the right to search the vehicle existed at the time and place of seizure, the latter course of action was held to be valid by the Court.

"The decision in *Chambers v. Maroney,* which relies upon the inherent mobility of a vehicle even after the mobility has in fact been negated, is justified in part by the view that there is less expectation of privacy associated with a vehicle than with personal effects or premises, and therefore greater warrantless intrusions are permissible than with other privacy interests."[5]

Contrary to the argument of the defendant, it was not necessary under the facts here to obtain a search warrant before seizing the marijuana taken from the car after

[5] Wm. Ringel, *Searches And Seizures, Arrests And Confessions,* sec. 11.1(b), (2d ed. 1980).

the arrest. As was stated by the United States Supreme Court in *Chambers v. Maroney,* 399 U.S. 42, 51–52 (1969):

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

The lesser "expectation of privacy" and mobility are factors the United States Supreme Court has emphasized in sanctioning warrantless searches of automobiles. Such searches have been permitted even when mobility had ceased to be a factor.

"But this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts. *Carroll v. United States,* 267 U.S. 132 (1925); *Preston v. United States, supra,* at 366–367; *Chambers v. Maroney,* 399 U.S. 42 (1970). See also *South Dakota v. Opperman,* 428 U.S. 364, 367 (1976).

"Our treatment of automobiles has been based in part on their inherent mobility, which often makes obtaining a judicial warrant impracticable. Nevertheless, we have also sustained 'warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent.' *Cady v. Dombrowski,* 413 U.S. 433, 441–442 (1973); accord, *South Dakota v. Opperman, supra,* at 367; see *Texas v. White,* 423 U.S. 67 (1975); *Cham-*

*bers v. Maroney, supra; Cooper v. California,* 386 U.S. 58 (1967).

"The answer lies in the diminished expectation of privacy which surrounds the automobile:

" 'One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . It travels public thoroughfares where both its occupants and its contents are in plain view.' *Cardwell v. Lewis,* 417 U.S. 583, 590 (1974) (plurality opinion)." *United States v. Chadwick,* 433 U.S. 1, 12 (1977).

We conclude that the search of the defendant's car following his arrest was proper and was not in violation of his Fourth Amendment rights. It follows that the contraband seized was properly admissible in evidence.

Finally, the defendant asserts that the trial court abused its discretion by failing to modify the defendant's conditions of probation by reducing the amount of the $3,000 fine imposed.

The defendant was convicted of the offense of possession of a controlled substance with intent to sell in violation of sec. 161.41(1m), Stats. This offense is punishable by a fine of not more than $15,000 or a prison term of not more than three years.[6]

The trial court imposed a two-year sentence, but stayed the sentence and placed the defendant on probation for two years. As a condition of probation the court ordered the defendant to pay a $3,000 fine. Half of the fine was to be paid before the end of the first year of probation and the remainder before the end of the probation term. There was no argument that this sentence was excessive at the time of trial, indeed the trial court specifically stated that he considered the offense to be a serious one and would normally have imposed at least some incarceration.

---

[6] *See* footnote 1, *supra.*

The imposition of a fine as a condition of probation is authorized by sec. 973.05(2), Stats. 1979–80.[7] Installment payment of a fine as a condition of probation was specifically upheld by this court in *State ex rel. Pedersen v. Blessinger,* 56 Wis.2d 286, 298, 201 N.W.2d 778 (1972). In *Will v. State,* 84 Wis.2d 397, 405, 267 N.W.2d 357 (1978), this court encouraged trial courts to permit fines to be paid over a period of time. In *Will,* the court also held that it is the defendant's responsibility to bring the question of his inability to pay a fine within the time set for its payment. *Will, supra,* 84 Wis.2d at 404.

In this case the defendant filed a post-conviction motion to modify his sentence, requesting the trial court to make a finding on defendant's ability to pay and to modify the sentence accordingly.

The defendant presented evidence of his living expenses and his income from employment, grants, student loans and assistance from the division of vocational rehabilitation. He also presented evidence of his indebtedness and assets. Defendant argued that he had monthly earnings of approximately $530 and expenses of approximately $520. His position was that he could only pay the $3,000 fine on the schedule imposed by his sentence if he quit school. The trial court concluded that:

"In view of the defendant's financial situation, however, I will modify the sentence to the extent that the

[7] "973.05. Fines. . . . (2) When a defendant is sentenced to pay a fine and is also placed on probation, the court may make the payment of the fine, the penalty assessment, any applicable domestic abuse assessment, any applicable natural resources assessment and any applicable natural resources restitution payments a condition of probation. When the payments are made a condition of probation by the court, payments thereon shall be applied first to payment of the penalty assessment until paid in full, shall then be applied to payment of the domestic abuse assessment until paid in full, shall then be applied to payment of the natural resources assessment if applicable until paid in full, shall then be applied to payment of the natural resources restitution payment until paid in full and shall then be applied to payment of the fine."

fine be paid during the period of probation, without the requirement of the first $1,500.00 during the first year. If it becomes necessary that probation be extended for the purpose of complying with this term of probation, the Court will entertain such a request at the appropriate time, but I do think that the monetary fine imposed by the Court is appropriate. It is not in my view, frankly, commensurate with the seriousness of the offense but it was imposed to impress on the defendant the seriousness of the crime with which he was convicted. So, to that extent, the sentence will be modified to provide that the fine be paid during the period of probation, without the requirement of $1,500.00 during the first year; and, as indicated previously, the Court will, as it is required to do by law, entertain a Motion to Extend Probation prior to the end of the first two year period in the event that should become necessary."

Contrary to defendant's assertion, this court is satisfied that the trial court properly considered the defendant's ability to pay and was satisfied that he was capable of meeting the fine imposed. The court, of course, had no way of knowing how the defendant's income would change over the term of probation, or even during school vacation periods. The trial court properly considered the appropriate factors involved and exercised his discretion. We find no abuse of discretion in this record.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The question presented in this case is whether the officer violated the defendant's rights under both art. I, sec. 11 of the Wisconsin Constitution and the fourth amendment to the United States Constitution.

We review the trial court's decision on this question using two standards: First, we will sustain the findings of fact of the trial court unless against the great weight and clear preponderance of the evidence. *Bies v. State,* 76 Wis.2d 457, 469, 251 N.W.2d 461 (1977). Second, we

will "independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is satisfied. *See State v. Carter,* 33 Wis.2d 80–89–96, 146 N.W.2d 466 (1966), *cert denied* 387 U.S. 911; *Ker v. California,* 374 U.S. 23, 33, 34, 83 S. Ct. 1623, 10 L. Ed2d 726 (1963)," *Bies v. State,* 76 Wis.2d 457, 469, 251 N.W.2d 461 (1977).

The majority concludes that the seizure involved here, that is detention after the officer determined the identity of the defendant and obtained an explanation for the defendant's conduct, did not amount to an arrest, and that probable cause, therefore, was not required. The majority concludes that the detention "was a justified stop supported by the officer's reasonable suspicion aroused by the defendant's and the passenger's conduct." *Supra,* at 213.

I do not decide whether the detention ever became an arrest. I conclude that after the defendant identified himself and explained the circumstances of his conduct the facts were insufficient to warrant his detention. I would hold that the officer violated the defendant's rights under both art. I, sec. 11 of the Wisconsin Constitution and the fourth amendment to the United States Constitution.

The applicable constitutional standard was set forth by the court in *Terry v. Ohio,* 392 U.S. 1, 21 (1968). It requires that the officer ". . . must be able to point to specific and articulable facts which taken together with relevant inferences from those facts, reasonably warrant that intrusion." The question is whether the facts available to the officer "warrant a man of reasonable caution in the belief 'that the action taken was appropriate.' " *Terry v. Ohio,* 397 U.S. at 22. *See* sec. 968.24, Stats. 1979–80.

No ironclad rule has been formulated to decide each case. The ultimate standard is reasonableness, and "it is necessary to examine both the character of the official intrusion and its justification." *Michigan v. Summers,*

—— U.S. ——, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). An investigative stop must be reasonably related in scope to the circumstances which justified the interference in the first place. The detention in this case, although in some respects not as intrusive as a custodial interrogation, *Dunaway v. New York*, 442 U.S. 200 (1979), was more intrusive than the *Terry* momentary stop. The nature of the governmental interest asserted by the prosecution in this case is not set forth and therefore the majority cannot show that the scope of the intrusion is reasonably related to its justification.

At the suppression hearing Officer Burch set forth the "specific and articulable facts" which he thought warranted his detaining the defendant. The officer testified in part as follows:

"*Q.* Now, at the time that you called for the assistance for the backup, what crime, if any, did you feel that either Goebel or DiMayo was in the process of committing, if any, at all? *A.* It's hard to say what went through my mind. I really didn't think.

"*Q.* You didn't have a specific—.

"*The Court:* Let him answer the question.

"*Q.* (By Mr. McNally) I'm sorry, your Honor. *A.* At the time, as I stated, it's hard to say what was going through my mind, although I recall that there had been burglaries in the area. I didn't know. You know. Possibly they had just committed a burglary. I didn't know.

"*Q.* You didn't know? *A.* But I was suspicious of them, okay.

"*Q.* And you had called in on this premise, had you not, that you were suspicious? *A.* I called for a backup, yes.

"*Q.* But you weren't specific in your mind as to what that suspicion was, were you? *A.* I didn't know what they did, no.

"*Q.* You didn't have any specific suspicion in your mind as to what crime, if any, either DiMayo or Goebel were about to commit, did you? *A.* No.

"*Q.* And likewise you had no specific suspicion in your mind as to what crime either DiMayo or Goebel may have committed, is that correct? *A.* Several went through my mind.

"*Q.* And what were they? *A.* Possibly a burglary. It's been many times in the past where I have pulled up behind cars and the driver and the passenger—.

"*Mr. McNally:* —Your Honor,—.

"*Mr. Williams:* —Let him answer the question. You asked it.

"*Mr. McNally:* I would ask that—. I want to state that I don't think this is responsive.

"*The Court:* Read the question back, please.

"(Question read.)

"*The Court:* The answer is responsive. You may continue your answer.

"*Mr. Burch:* As I stated, it might have been possibly a burglary. Many times in the past I have pulled up behind vehicles and these things are being put underneath the seat or parties are trying to get rid of things. It's been things that have been in the past that kind just led me to be suspicious of these parties.

"*Q.* (By Mr. McNally) But could you tell me, specifically, what crime you believed either DiMayo or Goebel or both of them together had recently committed?

"*Mr. Williams:* Your Honor, I think he's answered that.

"*The Court:* He can answer again. Objection overruled.

"*Mr. Burch:* There is no specific crime. It was a general—. You know.

"*Q.* (By Mr. McNally) And that was your suspicion because of this alleged movement you saw; is that correct? *A.* Not that alone, no.

"*Q.* What else? *A.* The vehicle being parked where it was. The area is rather open but there are a few houses that are in the area and, as I stated, there had been burglaries out in that area before.

"*Q.* And what do you mean by 'before?' *A.* Approximately a month prior to that there was a burglary, two burglaries at the same residence, just approximately a quarter mile away, a quarter mile south of where they were."

Officer Burch was also asked if there was any report of a crime in that area prior to Goebel's arrest:

"*Q.* Alright. There was no report of a crime that had taken place in that area prior to their arrest? *A.* Not that day but prior to, yes.

"*Q.* But not that day, had there? *A.* Not that day, no."

Thus the testimony is that Officer Burch's suspicion was based on the geographic location (*i.e.* one-quarter of a mile from were a burglary had taken place a month earlier) of the vehicle for which Goebel had already offered an explanation—car trouble, the passenger's movement to put something under the seat, the defendant's and passenger's nervousness, and the movement of both men about the vehicle which could be interpreted as intended to keep the officer from looking into the car. Burch testified that he radioed for assistance because he "felt the parties were very suspicious." Burch repeated several times that the men were "suspicious," underscoring the lack of specific articulable facts on which his conclusion was based.

In my opinion "specific and articulable facts," which would warrant a reasonably cautious officer in light of his experience to believe criminal activity was afoot, are missing in this record. It appears that the officer acted on what the record reveals was an "inchoate and unparticularized suspicion or 'hunch'," *Terry,* 342 U.S. at 27. That the hunch proved correct does not in my view render the officer's conduct constitutionally inoffensive.

Even if I were to conclude that the detention was based on reasonable suspicion, I do not agree with the majority's reasoning that the defendant voluntarily exposed the contraband to the officers. Apparently the majority holds, as did the trial court, that the defendant consented to the search of the area under the seat by carrying out the search himself. The burden of proving consent is on the state, and the burden must be sustained by clear and convincing evidence. *Kelly v. State,* 75 Wis.2d 303, 316, 249 N.W.2d 800 (1972). Consent must in fact be freely

and voluntarily given and whether the consent was voluntary is to be determined from the totality of the surrounding circumstances, including subtly coercive police questions. As the United States Supreme Court said in *Schneckloth v. Bustamonte,* 412 U.S. 218, 228 (1973): "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte,* 412 U.S. 218 at 229.

The officer's questions addressed to Goebel asking what was placed under the seat must be viewed not in isolation but in the context of the circumstances occurring prior to and during the officer's questioning. The request was made after the second police car positioned itself in front of defendant's car and after Valdes, the second officer to arrive, had positioned himself at the passenger door. This record shows that the defendant did not believe that he was free to end the conversation and leave; the record suggests that the defendant acted in a manner contrary to his self-interest because he felt compelled to answer the officer's questions. It is clear in this case that the officers continued to detain defendant in order to find out what was put underneath the seat in the car as the officer drove up. "Consent cannot be presumed from a showing of acquiescence to authority . . . . *United States v. Mendenhall,* 446 U.S. 544, 566–567 (1980) (White, J. dissenting opinion).

I conclude, based upon the pattern and intensity of the investigation as set forth in the record, that the consent in this case was coerced and that the trial court's finding of voluntariness and consensual search is not supported by the evidence in the record.

Finally, I am unable to agree with the majority that the warrantless search of the defendant's vehicle after his

arrest was valid as a search incident to an arrest. "The word automobile is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire,* 403 U.S. 443, 462 (1971); *Arkansas v. Sanders,* 442 U.S. 753, 760, n. 7 (1979).

In this case the automobile was searched after the defendants had been arrested and placed in separate squad cars. The contents of the automobile were not within the immediate control of either Goebel or DiMayo. "Under Chimel, the question is not whether the defendant could have reached a certain area on a prior occasion; rather, it is whether the defendant can *presently* (*i.e.,* at the moment of search) reach that area." 2 LaFave, *Search and Seizure* sec. 7.1, p. 501 (1978). After the defendants were secured in the squad cars there was no possibility that either defendant would obtain a weapon from the car or destroy evidence contained therein. Thus the reasons for the rule permitting searches incident to a lawful arrest are inapplicable in this case. *See United States v. Robinson,* 414 U.S. 218, 234–235 (1973). The search incident to a lawful arrest exception is inapplicable. *Chimel v. California,* 395 U.S. 752, 763 (1969). *Cf. State v. Prober,* 98 Wis.2d 345, 357–359, 297 N.W.2d 1 (1980). Nor was there a danger that the vehicle, though inherently mobile, would be removed from police view. Officer Burch testified that a tow truck was called after the arrest was made to take the vehicle to the police station. No exigent circumstances were shown to exist; no proper inventory search is claimed.

For the reasons set forth, I dissent.