433 A.2d 50
**COMMONWEALTH of Pennsylvania**
v.
**Peter William LEVEILLE, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 10, 1980.
Filed July 24, 1981.

Joseph A. Massa, Jr., Warren, for appellant.

Richard A. Hernan, Jr., District Attorney, Warren, for Commonwealth, appellee.

Before PRICE, CAVANAUGH and HOFFMAN, JJ.

HOFFMAN, Judge:

On August 2, 1979, a jury found appellant guilty of arson, causing a catastrophe, and burglary. Following denial of post-verdict motions and imposition of sentence, appellant took this appeal, in which he contends that several inculpatory statements which he made while in custody were improperly admitted into evidence. Finding appellant's contentions to be unpersuasive, we affirm the judgment of sentence.

On February 2, 1979, a fire of suspicious origin destroyed several buildings in the Borough of Tidioute, Warren County. The next day, at approximately 7:45 p. m., appellant

was arrested by local police while hitchhiking on an area highway. Although the charges on which appellant was arrested were unrelated to the fire, the record establishes that at the time of his arrest police suspected appellant of having set the blaze. Appellant was informed of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), arraigned on the arrest charges, and, at approximately 9:10 p. m., taken to the local barracks of the state police where he was questioned about both the arrest charges and the fire. Appellant agreed to take a polygraph test, and after the polygraph operator challenged his truthfulness, appellant admitted at approximately 2:05 a. m. on February 4, that he had set the fire.[1] Appellant then requested a lawyer, and at approximately 3:15 a. m., appellant's present counsel arrived and consulted with appellant privately for at least ninety minutes. Thereafter, appellant was again given *Miranda* warnings, and at approximately 4:50 a. m., with counsel present, appellant gave an oral confession which was tape recorded and later introduced at trial. Appellant was then formally charged with the offenses of which he now stands convicted.

Appellant contends first that his tape recorded confession was of such poor audio quality that it should not have been admitted into evidence. The record reveals that the trial judge listened to the tape at a pretrial conference and determined that it was sufficiently audible to be admitted. Subsequently, the tape was played for the jury, over appellant's objection, on the second day of the three-day trial. Approximately three-and-one-half hours after they had retired to deliberate, the jury asked to hear the tape once again. In a colloquy with the trial judge, the jury foreman explained that the jurors' request resulted from their inability to agree on what they had heard on the tape. The

1. This confession was subsequently suppressed as having been obtained in violation of *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). In *Davenport,* our Supreme Court mandated that "[i]f the accused is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment shall not be admissible at trial." *Id.,* 471 Pa. at 286, 370 A.2d at 306 (footnote omitted).

foreman attributed the jury's difficulty in part to the quality of the tape, but he did not claim that the recording was inaudible.[2] Both appellant and the Commonwealth opposed replaying the tape, and the trial judge ultimately denied the jury's request. The jury then resumed their deliberations and arrived at their verdict within forty-five minutes.

Although we have found no Pennsylvania appellate decisions directly on point, we are guided by cases from other jurisdictions which have considered the issue presented. In *State v. Donato*, 414 A.2d 797 (R.I.1980), the Supreme Court of Rhode Island stated:

Most jurisdictions ruling on the admissibility of sound recordings of imperfect quality or partial inaudibility have held that a recording will be admissible unless the inaudible portions or omissions are so substantial as to render the recording as a whole untrustworthy. *United States v. Avila*, 443 F.2d 792, 795 (5th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971); *State v. Dye*, 60

**2.** The relevant portion of the trial judge's colloquy with the foreman is as follows:

> *BY MR. WINTER [THE FOREMAN]*: The Jury has requested that we hear the taped confession.
> *BY THE COURT*: And would you state why?
> *BY MR. WINTER*: Because there's a discrepancy between what we felt we have heard when we heard it for the first time.
> *BY THE COURT*: And what do you mean by a discrepancy?
> *BY MR. WINTER*: Some people feel they heard one thing; other people heard another thing.
> *BY THE COURT*: Does this go to the quality?
> *BY MR. WINTER*: It's to do with the quality, and also just exactly what people heard. I mean, the quality certainly had a lot to do with it. I mean, it was awful hard to hear.
> *BY THE COURT*: There—Is there disagreement as to what was heard?
> *BY MR. WINTER*: There's disagreement as to what was heard.
> *BY THE COURT*: That's the audibility?
> *BY MR. WINTER*: As to specific words that were heard.
> N.T. 357–58.

It should be noted that the tape was transcribed stenographically by the court reporter as it was being played for the jury, and it is reproduced in the notes of testimony almost in its entirety, with very few indications of inaudible passages. Thus, at the very least, the tape was sufficiently distinct to be heard and understood by the court reporter.

N.J. 518, 531, 291 A.2d 825, 831, *cert. denied*, 409 U.S. 1090, 93 S.Ct. 699, 34 L.Ed.2d 675 (1972); *see Bentley v. State*, 397 P.2d 976, 979 (Alaska 1965); *State v. Salle*, 34 Wash.2d 183, 193, 208 P.2d 872, 878 (1949). Furthermore, these courts would leave the matter of the admissibility of such recordings to the sound discretion of the trial court. *See United States v. Avila*, 443 F.2d at 795 (5th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971). 414 A.2d at 805. *Accord, United States v. Lawson*, 347 F.Supp. 144, 147 (E.D.Pa.1972) (collecting cases). *See also Smith v. State*, Ind., 397 N.E.2d 959, 962–63 (1979) ("the focus is upon whether the recording taken as a whole, or a crucial segment thereof, is of such poor quality that it is likely to lead to jury speculation as to its contents"); *People v. Sacchitella*, 31 App.Div.2d 180, 295 N.Y.S.2d 880 (1968) (same). *See generally* Annot., 57 A.L.R.3d 746, 752–54 (1974) (collecting cases).

 Applying these principles to the present case, we are convinced that the trial judge did not abuse his discretion in admitting the tape recorded confession. The judge carefully listened to the tape *in camera* before trial "and had no difficulty in audiobility [*sic*]." Lower Court Opinion at 5. Although the judge did "acknowledge that the tape was not of the best quality," *id.*, he nonetheless concluded that it was distinct enough to identify the speakers and understand what was being said. Moreover, the jury's request to have the tape replayed does not, as appellant suggests, warrant the conclusion that the unintelligible portions were so substantial as to render the recording as a whole untrustworthy. Although the jury foreman indicated that the tape was hard to hear, his colloquy with the trial judge indicates that the jurors' primary difficulty was in agreeing on exactly what they had heard, a common problem among jurors called upon to recall several days' testimony. Moreover, the trial transcript reflects that the court reporter apparently was able to comprehend most of the tape and identify the speakers. *See* note 2 *supra*. Under these circumstances, we think it proper to defer to the trial judge, who necessarily

was in a superior position to determine the audibility of the tape and its trustworthiness as evidence.[3]

■ Appellant contends next that his tape recorded confession should have been excluded as the product of the coercive circumstances which occasioned the suppression of his earlier statement to the polygraph operator. As noted above, however, appellant's first confession was suppressed because it was obtained in violation of the six-hour rule of *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), and not because it was the product of any coercion. *See* note 1 *supra*.[4] Moreover, even if appellant's first confession were the product of coercive circumstances, exclusion of his taped confession on that basis would not have been warranted. After giving his first confession, appellant conferred privately with his attorney at state police headquarters for at least ninety minutes. He then gave his taped confession in the presence of counsel. Our Supreme Court approved the admission of a confession given in similar circumstances in *Commonwealth v. Cunningham*, 471 Pa. 577, 370 A.2d 1172 (1977). There, as here, the defendant confessed after an unhurried conference with, and in the presence of, counsel. Our Supreme Court emphasized the

3. Appellant contends additionally that the Commonwealth failed to establish a proper foundation for admission of the tape. In *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967), *vacated*, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968), *appeal after remand*, 449 Pa. 33, 296 A.2d 524 (1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 963 (1973), our Supreme Court stated that " '. . . [T]ape recordings are admissible in evidence when they are properly identified and are a true and correct reproduction of the statements made, and when the voices are properly identified.' " 427 Pa. at 308, 234 A.2d at 566 (quoting *Commonwealth v. Bolish*, 381 Pa. 500, 524, 113 A.2d 464, 477 (1955)). At trial Trooper Myron Fernstrom of the state police testified that he had made the tape of appellant's confession which was played at trial and that the tape fairly and accurately reproduced what was said. Moreover, the identity of the voices on the tape was established by Trooper Fernstrom and by the tape itself. Accordingly, appellant's claim is without merit.

4. We need not consider whether the tape recorded confession was also obtained in violation of the *Davenport* rule, as appellant has not raised the issue.

effectiveness of counsel's presence as a safeguard against compulsion, and concluded that the defendant's opportunity to confer freely with counsel before confessing sufficed to purge the taint of any prior illegalities. *See also Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978); *Commonwealth v. Cockfield*, 465 Pa. 415, 350 A.2d 833 (1976); *Commonwealth v. Mastrota*, 269 Pa.Super. 485, 410 A.2d 360 (1979). Similarly here, appellant's extended conference with counsel before giving his taped confession was sufficient to insulate the confession from the effect of any prior coercive circumstances. Thus, appellant's contention is without merit.

■ Appellant contends finally that the suppression court should have suppressed additional inculpatory statements which he claims were the product of custodial interrogation not preceded by the giving of *Miranda* warnings. In reviewing the denial of a motion to suppress, we "consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Riggins*, 451 Pa. 519, 522, 304 A.2d 473, 474 (1973) (quotations omitted). So viewed, the facts relevant to appellant's contention may be summarized as follows. While awaiting trial in this case appellant was incarcerated in the Erie County Jail.[5] Early on the morning of June 13, 1979, appellant reported that he had been sexually assaulted by an inmate, and he requested that the incident be investigated. Consequently, authorities at the jail contacted the Erie Police Department, and Detective Sergeant William Turner was assigned to investigate the matter. At that time Turner neither knew appellant nor was aware of the charges on which appellant was being held; he knew only that he was to investigate a complaint of sexual assault which had been lodged by one of the inmates at the jail. Turner did not learn of the charges against appellant until he arrived at the jail to commence his investigation. Once there, Turner

5. Appellant apparently was detained at the Erie County Jail rather than in Warren County because he was "a security risk." N.T. 289.

interviewed appellant about the incident. In response to questioning, appellant informed Turner that his assailant had been able to force him to submit to the assault because he knew certain information about appellant. Turner then asked appellant to describe this information. Appellant responded that he had told his assailant that he had set the fire in Tidioute, describing his activities to the assailant in some detail pursuant to a fanciful scheme which the two had conceived to secure the assailant's release from jail and somehow assist appellant's defense at trial. Turner then pressed appellant further about his story to the assailant, whereupon appellant specified several minor inaccuracies in his story to the assailant which he believed his attorney would be able to exploit at his eventual trial.[6] Turner then gave appellant *Miranda* warnings and asked him if he wished to continue the interview. After hesitating briefly, appellant answered affirmatively and proceeded to reiterate his explanation of how his assailant had been able to compel him to submit to the alleged assault.

"It is axiomatic that a confession to be valid must be given free of any physical or psychological coercion which might interfere with one's will to resist. . . . Further, where . . . custodial interrogation involves the waiver of constitutional rights guaranteed under the Fifth and Sixth Amendments, the record must clearly demonstrate that the accused was fully apprised of his rights and knowingly made the decision to waive them." *Commonwealth v. Cunningham*, 471 Pa. 577, 582, 370 A.2d 1172, 1175 (1977) (citations omitted). Appellant contends that his interview with Turner constituted a "custodial interrogation," and that Turner was therefore required to apprise him of his rights pursuant

---

**6.** The relevant details of the story which appellant informed Turner he had told his assailant were that appellant had broken a window in a hotel in Tidioute, entered the building, gone upstairs, kicked down a door, stolen $2,000, set a fire upstairs, and then set several more fires downstairs before leaving. Appellant subsequently informed Turner that his story to the assailant was inaccurate in that he had not kicked down a door, he had stolen a sum of money less than $2,000, and he had set a fire in the upstairs portion of the building only.

to *Miranda* at the outset of the interview. In support of this contention appellant refers us to the case of *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in which the United States Supreme Court set forth a definition of "interrogation" in the context of *Miranda*. In *Innis* the Court held that

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. at 300–302, 100 S.Ct. at 1689–90 (emphasis in original) (footnotes omitted).

■■■ Applying this test to the facts described above, we are convinced that the suppression court did not commit reversible error in refusing to suppress appellant's inculpatory statements to Turner. In our view Turner was not required to give appellant *Miranda* warnings at the outset of the interview because at that point he was neither expressly questioning appellant about the charges against him nor

engaging in any actions which he should have known were reasonably likely to elicit an incriminating response from appellant. Turner simply asked appellant to explain the facts surrounding an attack of which he had complained pursuant to an investigation which he had requested. Although Turner was aware at the start of the interview of the charges on which appellant was being held, we do not believe, as appellant suggests, that this knowledge should have led Turner to anticipate that his questions concerning the alleged assault would evoke an incriminating response. Consequently, we view appellant's initial incriminating statement to Turner as having been " 'given freely and voluntarily without any compelling influences ... [and thus,] of course, admissible in evidence.' " *Rhode Island v. Innis, supra* at 299–300, 100 S.Ct. at 1689 (quoting *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630). It may be argued that after appellant had initially told Turner of his involvement in the fire, the focus of the interview shifted away from the assault and toward the charges against appellant, and thus that Turner's subsequent inquiry about appellant's story to the assailant should have been preceded by the giving of *Miranda* warnings. As we have observed, however, appellant had already voluntarily incriminated himself, and the evidence of his answers to Turner's subsequent questioning revealed only inconsequential inaccuracies in the inculpatory story which he had told his assailant and which was properly before the jury. Under these circumstances, we are convinced beyond a reasonable doubt that evidence of appellant's responses to questions asked after his initial incriminating statement to Turner could not have affected the jury's verdict, and thus any error in admitting this evidence was harmless. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). Accordingly, appellant's contention cannot be sustained.[7]

Judgment of sentence affirmed.

7. Appellant contends additionally that the lower court improperly permitted a trooper assigned to the fire marshal division of the state police to testify as an expert witness and express opinions on subjects outside his area of expertise. " '[T]he question whether a

witness is qualified to testify as an "expert" is within the sound discretion of the trial court and will not be overturned except in clear cases of abuse.'" *Commonwealth v. Stickle*, 484 Pa. 89, 104, 398 A.2d 957, 965 (1979) (quoting *Commonwealth v. Bennett*, 471 Pa. 419, 424, 370 A.2d 373, 375 (1975)). Our review of the record persuades us that the lower court did not abuse its discretion in allowing the trooper to testify as an expert and state his opinion.