**COMMONWEALTH of Pennsylvania,**
**Appellant,**

v.

**Zachary P. WITMAN, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 18, 2000.

Filed March 28, 2000.

Hugh S. Rebert, Dist. Atty., York, for Commonwealth, appellant.

Thomas L. Kearney, York, for appellee.

Before DEL SOLE, TODD and TAMILIA, JJ.

TAMILIA, J.:

■ ¶ 1 The Commonwealth appeals from the May 7, 1999 Order suppressing certain evidence necessary for the criminal homicide prosecution of appellee, Zachary Witman.

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Nester,* 551 Pa. 157, 160, 709 A.2d 879, 880–881 (1998) (citation omitted). Upon careful and independent review of the record, we find the suppression court's findings of fact to be well supported.

On October 2, 1998, thirteen year old Gregory Witman was killed in his home in New Freedom, Pennsylvania. Gregory's brother, the [appellee] Zachary Witman, placed a 911 telephone call requesting emergency assistance at approximately 3:17 p.m. EMT, fire, and police personnel responded to the Witman home. EMT and fire personnel were the first to arrive at the scene. The Southern Regional Police Department arrived at approximately 3:25 p.m. Officer Sean Siggins was the first law enforcement officer on the scene. An EMT approached Officer Siggins and advised him that "he had a crime scene." Officer Siggins observed the [appellee] standing in the garage with EMT Weigle. Officer Siggins observed that the [appellee] was in an excited state, and was holding a telephone. Blood was visible on the telephone as well as the [appellee's] hands and shirt. Officer Siggins spoke briefly with the [appellee], and testified regarding that conversation as follows:

He [the appellee] at first just said he had to call his mom, he had to call his mom. I requested—I got some information from him, his name, why we were there. He said that he was home sleeping. He left a key in the door for his brother to get home. He heard a thud downstairs like something was getting thrown against the wall, came downstairs, found his brother, and called 911.

After speaking with the [appellee], Officer Siggins walked to the doorway in the garage leading to the laundry room in the house and observed Gregory's body on the laundry room floor.

Chief James Childs arrived at the scene at approximately 3:30 p.m. He met Officer Siggins on the driveway and instructed the officer to conduct a canvass of the neighborhood after he had composed himself. Chief Childs observed Gregory's body from the doorway into the laundry room, then returned to his car to get crime scene tape. He instructed the Deputy Fire Chief to assign a fire fighter to mark a police area. The police area was marked with tape establishing the perimeters of the crime scene and sealing it off from unauthorized persons. A list was maintained upon the instruction of Chief Childs of all who entered the perimeters of the crime scene.

Chief Childs then approached the [appellee], who "was screeching in a high pitched voice" and indicating that he had to call his mother. Chief Childs also observed blood on the front of the [appellee's] sweatshirt. Chief Childs then went to where EMT Neal was standing near the door and spoke to him concern-

ing what the EMT had observed. EMT Neal indicated that he did not know if there was anyone else inside the house. Chief Childs then conducted a "security sweep" of the premises to determine if anyone was inside.

While conducting the "security sweep" Chief Childs indicated that he saw droplets of blood on the linoleum kitchen floor. In the hallway he saw large amounts of blood on the floor, as well as a broken table, a jacket, a book bag, and a key ring neck chain. He then proceeded into the family room, then into a "formal room," then in the foyer where he observed blood on the front door and on the walls. From here he could again see the book bag and the broken stand. Chief Childs then went upstairs, observing that all the doors were closed save for the bathroom door, through which he could see a towel on the floor. He went into and quickly scanned all of the upstairs rooms before going back downstairs. Chief Childs went through what he described as a formal dining room, through the kitchen, and out the door to the outside of the house where he radioed for further assistance.

At this time, Chief Childs followed the [appellee] as he and EMT Weigle walked to the ambulance which was at the end of the driveway. Chief Childs saw Detective Goodfellow arrive at the scene, and approached him. Chief Childs told Detective Goodfellow what his observations had been and that a crime scene had been established. Then Chief Childs and Detective Goodfellow approached the ambulance together. Chief Childs identified himself to the [appellee] and asked if the [appellee] could "help us with this incident." The [appellee] gave a brief statement before becoming visibly upset, and asked Chief Childs to call [his] mother. Specifically, Chief Childs testified concerning the [appellee's] statements as follows:

At this point he told me he [the appellee] was upstairs sleeping. He heard the front door open, heard the front door close. He heard what appeared to be a struggle. And the whole time he's talking to me and relaying this, his voice was elevating, lowering, quivering. And each time he would talk I would have to ask him to calm down and try to speak softly and more clear so I could understand what he was saying.

He then said he heard what appeared to be a struggle. He came downstairs, observed blood on the floor of the hallway, went out into the kitchen and found his brother laying on the floor. I then asked him did he see anyone or hear anything. He said no, and all he kept saying at that point [was] that his brother was suffering, just suffering, just suffering and repeatedly saying that.

He started to become physically upset again where his voice was screaming. He asked to call his mother. He was worried about his dad. I reassured him that we would take care of contacting his parents, and then he looked at me and said, would you please call my mother.

. . .

I said I would call his mother. How do I get in touch with her? He then told me that her phone number is on the refrigerator door on a piece of paper.

While the record is unclear, it appears that the [appellee] left for the hospital in the ambulance at approximately 3:45 p.m. Chief Childs instructed Officer Boddington, who had arrived upon the scene, to follow the ambulance and secure the [appellee's] clothing. After speaking with the [appellee], Chief Childs and Detective Goodfellow re-entered the house where Chief Childs indicated to Detective Goodfellow what evidence he had seen on his initial protective sweep. Thereafter, Chief Childs requested the Pennsylvania State Police

Crime Scene Investigation Unit to respond to the scene. He also obtained the [appellee's] mother's telephone number from the refrigerator, as the [appellee] had requested, and placed a call to her from a neighbor's home. Chief Childs also called the Airport Police Division of BWI Airport to attempt to locate the [appellee's] father when his flight arrived from Chicago.

It is unclear exactly when Mrs. Witman, the [appellee's] mother, arrived at the household from her work, however it appears to have been between fifteen minutes to an hour after the [appellee] was taken to the hospital. When Mrs. Witman arrived, Chief Childs approached her at the end of the driveway. His testimony on direct examination concerning what happened next was as follows:

A. . . .I walked up to her, put my arm around her. I again told her I was sorry for the loss of her son. I then started explaining to her what we were going to do as far as what we needed to do as far as processing the crime scene to obtain clues, evidence, to help us do our investigation.

Q. What did you say to her specifically?

A. I told her we were going to process the crime scene.

Q. Okay. And when you advised her of that, what did she respond?

A. Well, she wanted to go down and see her—she kept saying she wanted to see her baby. I told her that I couldn't allow her to do that because I wanted to maintain the integrity of the scene.

Q. What did she say when you told her you wanted to maintain the integrity of the crime scene for processing?

A. She told me I better do my job and find out who did this.

. . .

Q. Why didn't you get a search warrant at that point after you had these discussions with the [appellee's] mother?

A. I felt that, you know, after me advising her what we were going to do to her residence, I just—you know, nothing was ever transpired saying no, we couldn't do this, or yes, we could do this. I just assumed that, you know, she knew what I wanted to do and what the detective team was going to do. I explained to her that we called in people that were specialized in processing crime scenes, photographs, and I just—we just did it.

Two members of the State Police crime scene unit arrived at approximately 4:30 and 5:30 respectively. The Chief County Detective from the Office of the District Attorney reported to the crime scene as well as the first assistant district attorney and a deputy district attorney. The state trooper from the crime scene investigation unit who arrived at 4:30 began to photograph the outside of the Witman residence, and the crime scene unit began to process the scene at 5:30 upon Trooper Woodcock's arrival. Preliminary processing of the scene had already begun by the time Chief Childs relayed Mrs. Witman's words, "you better do your job," to Detective Goodfellow. At that juncture in the processing, photographs had been taken, and Trooper Woodcock had identified some specific areas of evidence of which he wanted samples or photographs taken. The preliminary processing of the crime scene prior to Mrs. Witman's arrival was largely exterior to the household and the open attached garage.

During the ambulance ride to the hospital, the [appellee's] sweatshirt and socks were removed by EMT Weigle at the [appellee's] request, and were placed inside a plastic bag. She also wiped the [appellee's] hands with a towel and placed that towel in a bag as well. An alcohol swab and a glove

used by EMT Weigle were also placed in a bag. These items were eventually given to Officer Boddington at the hospital. Officer Boddington requested the EMT to turn over the items to him.

Detective Clancy of the District Attorney's Office arrived at the hospital between 5:15 and 5:30 p.m. Beginning at approximately 5:45, Detective Clancy spoke with the [appellee] for fifteen to twenty minutes. He introduced himself and told the [appellee] that he was safe. Detective Clancy began the conversation by talking about soccer and sports. According to Detective Clancy, the [appellee] indicated that he "had been home sick from school and that he had stayed in his room, or he had been in bed all day and that he heard some noises and he thought it was his brother coming home from school. He had been asleep, and that he came down to check on the noise and he saw blood at the front door, and that he found his brother in the laundry room." Afterward, Detective Clancy spoke briefly with Mrs. Witman, who had arrived after the Detective began speaking with the [appellee]. Detective Clancy then spoke with the [appellee] again while his mother was present.

Mr. Witman arrived at the hospital at approximately 8:00 p.m. There he was met by Detective Clancy, and at some point thereafter Detective Clancy informed Mr. Witman what was occurring at his home concerning the processing of the crime scene:

A. I advised him that the police were on the scene. I was of course sent to the York Hospital to talk with [appellee] to gather information, and there were people at the scene, and it was going to be a long process because we needed to process the scene and gather up, you know, evidence, and that it would be a long process.

Q. And what was his response to those statements that you made?

A. He told me, "whatever it takes, do." . . .

Mr. Witman acknowledged that his response to Officer Clancy was: "Go find Greg's killer." Mr. Witman specifically denied that Detective Clancy utilized the term "processing scene" and gather up evidence. The Court will accept Detective Clancy's version of the conversation, as well as Mr. Witman's directive. Both are consistent with one another and plausible based upon the factual background. We note the [appellee] represented in his brief in support of his pretrial motion that his father made the statement "whatever it takes, do!" as what was said at the hospital. We further note that subsequent to the first day, Mr. Witman remained in contact with Chief Childs directly asking the police to return to the household to conduct further investigations within the house. Indeed one of the later search warrants for the household was initiated at Mr. Witman's request.

Detective Clancy returned to the crime scene between 8:30 and 9:00 and relayed Mr. Witman's remarks to the investigating officers. At approximately 12:30 the following morning, a chemical called Luminol (used to enhance the visibility of blood) was brought from the State Police Lab to the crime scene. Luminol was used to detect traces of blood and blood trails that were not visible with the naked eye. Upon application of the Luminol it is apparently the contention of the Commonwealth that various trails were discernable within and outside the household. The blood trails led to various locations throughout the house and yard including a "computer hutch" in the family room, and to a crop of trees next to a Jacuzzi in the back yard. A mound of dirt was discovered under the branches of one of

the trees. Excavation of the mound uncovered a knife and what were eventually identified as athletic gloves. Up to this point in time, the evidence collected by the Commonwealth was seized without a warrant. Thereafter, a warrant was sought for any additional seizures of evidence.

(Trial Court Opinion, Uhler, P.J., 5/7/99, at 2–10; citations to the suppression hearing transcript omitted.)

¶ 2 Upon review of the evidence, the court denied appellee's motion to suppress in part, admitting 50 items of evidence, and granted the motion in part, suppressing 22 items of evidence. In accordance with Pa.R.A.P. 311 **Interlocutory Appeals as of Right** (d) **Commonwealth Appeals in Criminal Cases**, the Commonwealth certifies that suppression of 16 of these 22 items of evidence terminates or substantially handicaps its prosecution of appellee.[1] The Commonwealth presents the following issues for our review.

I. Did the trial court err in ordering the suppression of sixteen items of evidence when the Appellee lacked a legitimate expectation of privacy in his residence following his request for police assistance after the murder of his brother?

II. Did the trial court err in ordering the suppression of sixteen items of evidence when the Appellee, his mother, Mrs. Amelia Sue Witman, and his father, Mr. Ronald Witman, gave their consent to the search and seizure of all evidentiary items within their home?

(Appellant's Brief, at 4.)

■ ¶ 3 We begin by addressing the Commonwealth's argument that in summoning police to his residence, appellee reduced his expectation of privacy therein. "[T]o prove a legitimate expectation of privacy in a structure, a defendant must establish that he has either a possessory interest or a legitimate presence, or he must establish some factor from which a reasonable and justified expectation of privacy can be deduced." *Commonwealth v. Gordon*, 546 Pa. 65, 74, 683 A.2d 253, 257–258 (1996), citing *Commonwealth v. Peterson*, 535 Pa. 492, 636 A.2d 615 (1993).

### Implied Consent

¶ 4 Under the facts of the present case, it is clear appellee had a legitimate expectation of privacy in the house in which he lived at the time he placed the 911 phone call.[2] A review of the transcript of the 911 phone call reveals appellee sought to obtain medical assistance for his brother. Although broadcast as a medical matter, the emergent nature of the call made essential the prompt assistance of emergency personnel, be it medical, police or fire.

- lift from inside of garage/laundry door;
- outside latch from screen door on rear screen porch;
- red "AP Long Lasting Mufflers" exacto type knife from appellee's bedroom;
- appellee's white socks taken from pink plastic bag obtained at the hospital; and
- appellee's pants and underwear.

---

1. The Commonwealth challenges the suppression of the following 16 items:
- blood sample from garage floor;
- blood sample from tile just inside garage door to house;
- table cloth from dining room table with blood on it;
- hair from molding on kitchen side of kitchen/laundry room door;
- welcome rug from foyer at front door;
- sample of unknown substance from back gate;
- trash from kitchen trash compactor;
- two knives from dishwasher in kitchen;
- clump of napkins from trash compactor bag;
- latent lift from inside front door (item # 33 in Motion to Suppress);
- latent lift from inside front door (item # 34 in Motion to Suppress);

2. A minor has the capacity to consent to the search of the family residence where the requirements for valid consent to search have been satisfied. *See United States v. Broaden*, 116 F.3d 1486 (9th Cir.1997), *cert. denied*, 522 U.S. 939, 118 S.Ct. 353, 139 L.Ed.2d 274 (1997); *Lenz v. Winburn*, 51 F.3d 1540 (11th Cir.1995) and *United States v. Clutter*, 914 F.2d 775 (6th Cir.1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991).

Thereafter, appellee opened the garage door of the house to allow emergency personnel quick access to his brother. Appellee informed police that he had been upstairs in his bedroom, heard a thud as if something was being thrown against a wall and went downstairs. Appellee explained that upon discovering his brother, he called 911.

¶ 5 Having found no case in this Commonwealth sufficiently on point, we look to the case law of our sister states for discussion of this matter. Our review leads us to conclude that a sound exception to the warrant requirement must exist where a defendant has summoned police and set the tone for the initial investigation.

¶ 6 In *Brown v. Texas*, 856 S.W.2d 177 (Tex.Crim.App.1993), the defendant called police and reported having discovered his wife dead in the garage. Upon arriving, police searched the detached garage and the home, based upon the information provided by appellant. The Texas Court of Criminal Appeals held:

> when a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. As long as the individual is not a suspect in the case or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible. This implied consent is valid only for the initial investigation conducted at the scene and does not carry over to future visits to the scene.

*Id.* at 182. *See also State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340 (1988)(by reporting to police that his wife had been killed in their restaurant, the defendant, who was not a suspect at the time, implicitly consented to the search of the restaurant and

authorized the subsequent investigation); *State v. Fredette*, 411 A.2d 65 (Me.1979)(defendant consented to the search of her home where she called police, reported that her husband had been shot and, through her conduct, cooperated, approved and encouraged the police in their search); *Kelly v. State*, 75 Wis.2d 303, 249 N.W.2d 800 (1977)(defendant consented to search of premises where she reported to police that the deceased had been shot and that she had been in another room of the house at the time of the shooting).

¶ 7 Upon careful review of the facts of the present case, we find in summoning emergency personnel for help and by communicating to police the idea that a murderer was at large, appellee implicitly consented to the police entry into the house.

### The Protective Sweep Doctrine

¶ 8 The manner in which the victim sustained his fatal injuries made clear that a crime had been committed. Moreover, through his statement to police, appellee clearly communicated to police that there was a murderer at large, perhaps still in the house. Without knowing whether anyone remained in the house and based upon the information provided to them by appellee, police properly recognized the possibility that there may have been victims, perpetrators or witnesses remaining at the scene. Accordingly, police conducted a protective sweep of the premises for purposes of determining whether anyone remained inside the house.

¶ 9 Under emergent circumstances, protective sweeps are a well-recognized exception to the warrant requirement. In *Commonwealth v. Crouse*, 729 A.2d 588 (Pa.Super.1999), *appeal denied*, 560 Pa. 738, 747 A.2d 364, 1999 Pa. LEXIS 3419 (1999), this Court held that properly conducted protective sweeps violate neither the Fourth Amendment of the United States Constitution nor Article I, Section 8 of the Pennsylvania Constitution. *Crouse*

involved police officers attempting to effectuate an arrest warrant at the defendant's home. Police, already lawfully inside the home, heard a woman's scream from the second floor of the home and immediately proceeded to the second floor "to secure the residence for the safety of the officers." *Id.* at 590. Upon review of the definition of a "protective sweep" as set forth in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), in conjunction with Pennsylvania case law discussing similar cursory searches, this Court held that protective sweeps are permissible pursuant to Article I, Section 8 of the Pennsylvania Constitution.

> The kind of sweep envisioned here is for persons. It cannot be used as a pretext for an evidentiary search. It cannot be lengthy or unduly disruptive. It must be swift and target only those areas where a person could reasonably be expected to hide. Above all, it must be supported by articulable facts and inferences giving rise to reasonable suspicion that the area to be swept harbors an individual posing a danger to the police.

*Crouse, supra* at 598.

¶ 10 While the facts of this case do not involve execution of an arrest warrant as in *Crouse*, they do create exigent circumstances at the greatest of levels. In *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486, where the facts involved fireman responding to a furniture store fire, the United States Supreme Court, in an opinion authored by Justice Stewart, held "it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." *Id.*, 436 U.S. at 509, 98 S.Ct. at 1950, 56 L.Ed.2d at 498. "A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable'". *Id.* So too in the present case, where there was a reasonable and appropriate belief victims, perpetrators or witnesses remained inside, the exigency was sufficient

to justify warrantless entry into the house. Based upon the information supplied by appellee, police had every reason to believe a third party had been and, more importantly due to the very short span of time between the murder and the police's arrival, perhaps, was still inside the house. Police had no reason to disbelieve appellee and, thus, we find the protective sweep to have been lawful and entirely appropriate. In conducting its protective sweep, it is well settled that all evidence observed in plain view is admissible. *Id.* Appellee's phone call to 911, in addition to his statement to police, upon their arrival, created a reasonable suspicion that victims, perpetrators or witnesses remained inside the house. The trial court fell into error when it treated appellee at the outset as a perpetrator rather than a victim for purposes of search and seizure when the police had every reason to believe otherwise. In his Opinion at page 15, the court states:

> In effect, the Commonwealth is asking the Court to ignore the time honored notion that a defendant is innocent until proven guilty.... Therefore, the [appellee] has a reasonable expectation of privacy in his home which was not abandoned by his calling for emergency assistance.

(Op. at 15–16.)

### The 911 recording and transcript

¶ 11 The suppression court found the contents of the 911 call to be irrelevant and, therefore, inadmissible. (*See* Trial Court Opinion, Uhler, P.J., 5/7/99, at 1–2, footnote 1.) The court explained that this evidence played no part in its consideration of the suppression issues. While this may be true, upon review of the record, we find no need for the exclusion of the 911 recording and transcript. This evidence forms the very foundation for the relationship appellee established with police. Appellee maintains no expectation of privacy with respect to his statements and, furthermore, careful review of the 911 tape fails to reveal unfair prejudice to the defense. To the contrary, the statements

made by appellee when he called 911 appear to be wholly consistent with all of his subsequent statements to the police. It may also be necessary during trial, as a truth-determining process, to test prior consistent or inconsistent statements on behalf of either the appellee or the Commonwealth. It is the best evidence of what transpired in the opening minutes of this event and as such may be required as evidence of the occurrence pursuant to Pa.R.E. 1002, **Requirement of Original.** At worst, the 911 recording and transcript would be cumulative and corroborative evidence; however, this evidence, more than any other, demonstrates what transpired in the opening moments of police involvement initiated by appellee and goes to appellee's state of mind. In his Opinion, the trial court acknowledged that police involvement originated with the 911 call and the contents of that call relayed to police are inseparable from their conduct in reaching the house and their treatment of the appellee. Based upon the foregoing, we find erroneous the suppression court's exclusion of the 911 recording and transcript. While the Commonwealth did not object to the ruling by the trial court on this issue, our ruling may avoid the necessity of an appeal on admissibility of the tapes or transcripts should the matter arise at trial.[3]

 ¶ 12 Accordingly, based on appellee's call for help and consent to search the premises, all evidence observed in plain view during the initial protective sweep is admissible.

### Duration of the permissible warrantless search

 ¶ 13 The suppression court found that while the evidence observed in plain

**3.** *See Commonwealth v. Rodriguez,* 519 Pa. 415, 548 A.2d 1211 (1988) (Tapes and transcripts of tapes are admissible at trial). *Commonwealth v. DeMarco,* 396 Pa.Super. 357, 578 A.2d 942 (1990) (Answering machine tapes were improperly suppressed). *Commonwealth v. Leveille,* 289 Pa.Super. 248, 433 A.2d 50 (1981) (Sound recordings are admissible as evidence unless deficiencies render the recording as a whole untrustworthy).

view during the protective sweep was admissible, subsequent searches conducted without a warrant failed to qualify under any exception to the warrant requirement. We disagree. While murder clues tend to turn cold quickly and, therefore, prompt investigation is essential, the idea of a "murder scene exception" was expressly rejected by the United States Supreme Court in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Nevertheless, where police are conducting a valid search pursuant to a defendant's implied consent, the initial investigation in its entirety is permissible. As explained in *Tyler, supra,* an investigation may require officials "to remain on the scene for an extended period of time repeatedly entering or re-entering the building ..." *Id.,* 436 U.S. at 510 n. 6, 98 S.Ct. at 1950 n. 6, 56 L.Ed.2d at 499 n. 6.

 ¶ 14 The record reveals that appellee presented himself as a victim, apparently grieving the loss of his brother and traumatized by the heinous nature of the murder scene. There is no indication police suspected appellee. The record supports a finding that police were conducting an investigation pursuant to the valid consent of the resident, i.e. appellee. Accordingly, we find the period of time during which police canvassed the area and entered (and re-entered) the home for purposes of their initial investigation constitutes one continual and initial search.

### Consent extending the warrantless search

¶ 15 The Commonwealth argues appellee's parents individually consented to the

*Commonwealth v. Groff,* 356 Pa.Super. 477, 514 A.2d 1382 (1986), *appeal denied,* 515 Pa. 619, 531 A.2d 428 (1987) (In a case of first impression, this Court held that the admission of 911 tapes, *which enhanced* the screams of the wife/victim during her killing, was improper as inflammatory; the conviction was affirmed as the admission constituted harmless error in light of overwhelming evidence independent of the 911 tapes.)

search of their home. In an effort to invalidate their statements, the defense argues neither parent gave a valid consent. We focus our attention on the following arguments:

a. The words articulated by mother fail to communicate consent;

b. The totality of the circumstances surrounding mother's statement vitiate a finding of consent; and

c. Father's statement, assuming it constitutes a valid consent to search, is not retroactive and does not validate previously conducted searches.

¶ 16 In determining whether valid consent was obtained, we apply the following standard.

Under both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, a search ... which is conducted without a warrant, is deemed to be per se unreasonable. Certain specifically established exceptions, one of which is a valid consent may, however, render an otherwise illegal search permissible. It is the state's burden to prove consent. This court, as well as the United States Supreme Court, has long adhered to the principle that for purposes of the Fourth Amendment, consent must have been given voluntarily.

*Commonwealth v. Cleckley*, 558 Pa. 517, 520, 738 A.2d 427, 429 (1999), *citing Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031 (1997), *Commonwealth v. Slaton*, 530 Pa. 207, 608 A.2d 5, 8–9 (1992), *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and *Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62 (1978).

¶ 17 Moreover, " 'voluntariness' is a question of fact to be determined from the totality of the circumstances and while knowledge of the right to refuse consent is a factor to consider in determining whether consent to search was voluntarily and knowingly given, it is not dispositive." *Cleckley*, *supra* at 522, 738 A.2d at 430,

*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

¶ 18 In this case, the mother arrived on the scene after appellee had been transported to the hospital. Understandably upset, mother expressed her desire to see her son (the victim). Police properly refused the mother's request, for the sake of preserving the integrity of the crime scene, as well as their concern for the mother's emotional and mental stability. The record reveals that mother was physically and emotionally distraught and stated to police, "You better do your job." Police testified that they understood this statement to be a consent to search. Moreover, under the circumstances *as they existed at the time mother made this statement*, police had every reason to believe they were dealing with a grief-stricken brother, and now mother, receptive to police and with every reason to welcome investigation. Additionally, the officers testified that they described in detail what was required in conducting an investigation of this nature and the defense can not convert the mother's acknowledgment and consent to a mere expression without significance. This is disingenuous and borders on sophistry. It would be ludicrous to impose upon police the hindsight knowledge that appellee would later become their primary suspect, where there was no indication of his culpability at the time of mother's statement. Furthermore, mother was at the house when she made her statement. Without making light of the excruciating pain mother must have been experiencing, it is clear mother was aware police were at the house and what their purpose was in being there. Even under the most restricted of interpretations, the only logical meaning of mother's statement is a directive to police to conduct their investigation. How else could the police "do their job" to find the killer if they were prevented from investigating the crime scene by a thorough search for evidence. We must reject the court's finding that the mother

failed to consent to the search that followed. Indeed, there is only a difference in semantics between her consent and that expressed by the father.

 ¶ 19 With respect to father's statement, as found by the trial court, we find the evidence clearly established the conveyance of voluntary and informed consent to search. The record reveals that father was reasonably calm and aware of the circumstances. Police communicated to father their need to "process the crime scene" and father responded by stating, "Whatever it takes, do."

¶ 20 Based upon the foregoing, we find that the initial valid and permissible warrantless search continued uninterrupted and that which was observed in plain view properly was seized. Furthermore, that evidence not in plain view also properly was seized in accordance with the consent of the appellee and his parents. Even had the consent of the mother not been valid, consent by the father to search the crime scene, which remained secured, would have led inevitably to the discovery of those items determined by the suppression court to have been improperly seized pursuant to mother's consent. As a result, these items would be properly admitted at trial on the basis of the "inevitable discovery" doctrine. *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996).

¶ 21 Accordingly, all evidence seized inside the house and on the property as a result of the initial sweep search, mother's consent and father's consent is admissible at trial. Likewise, the 911 recording and transcript are admissible for use at trial. We agree with the court's suppression of the six items seized pursuant to search warrants but for which there was a lack of probable cause or an inadequate description in the affidavits to the search warrants.[4]

¶ 22 Order reversed in part and affirmed in part; case remanded for trial.

¶ 23 Jurisdiction relinquished.

---

4. These items, numbered 17–22 on page 2 of the Order of May 7, 1999, follow:
 - Shovel, approximately 3 feet in length, wooden handle;
 - UHS tape with "Seinfeld Last Episode" written on it;
 - White Lanyard with Sports FOBS attached;
 - UHS–C tape adapter;
 - Telephone records pertaining to dates other than October 2, 1998 unless further relevance can be established; and
 - "America Online" information pertaining to the [appellee's] parents.