J-A03008-20

2020 PA Super 79

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JACOB WILLIAM FREDRICK, JR. | : | |
| | : | |
| Appellant | : | No. 770 MDA 2019 |

Appeal from the Judgment of Sentence Entered April 5, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0001412-2018

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

OPINION BY LAZARUS, J.:                     **FILED MARCH 31, 2020**

Jacob William Fredrick, Jr., appeals from the judgment of sentence, entered in the Court of Common Pleas of York County, following his conviction for possession of firearms—person not to possess.[1]  Upon careful review, we affirm.

On December 8, 2017, York Community Management (YCM) evicted Fredrick from his mobile home in Dover, Pennsylvania, for community rules violations.  N.T. Suppression Hearing, 6/25/18, at 8, 62.  The same day, Constables Moffit, Winslow, and Shannon[2] changed the locks on Fredrick's mobile home pursuant to YCM's eviction procedure.  *Id.* at 8-9, 30.  Victoria

_____

[1] 18 Pa.C.S.A § 6105(a).

[2] We note that, with the exception of Constable Robert Winslow, who testified on behalf of the Commonwealth, only the constables' surnames are provided in the record.  *See* N.T. Suppression hearing, 6/25/18 at 9, 29.

Walters, Fredrick's property manager at YCM, testified that the following day, she received messages from other residents in the mobile home community that they saw two vehicles and "the man who had lived there" on Fredrick's property. *Id.* at 10-13. Walters called the police, who investigated the matter and determined that the home was secure. *Id.* at 12.

On December 11, 2017, Walters received another message from YCM tenants that "other people were on [Fredrick's] property." *Id.* at 13. As Walters supervised another evicted tenant retrieve personal property from her home that day, she noticed Sergeant Michael Bosco, a veteran of the Newberry Township Police Department for 16 years, in front of Fredrick's trailer. *Id.* at 14, 33. Sergeant Bosco was on the premises in response to a 911-call from Fredrick that same day. *Id.* at 33-34, 58.

Fredrick spoke with Sergeant Bosco regarding a suspected burglary of his mobile home. *Id.* at 33-34, 58. Fredrick explained to Sergeant Bosco that he was evicted from his mobile home three days earlier. *Id.* at 34. Fredrick further explained that someone told him that his home had since been burglarized and that the back door was hanging open, and that Fredrick was unable to confirm whether either of these statements was true.[3] *Id.* at 34, 59. Fredrick advised Sergeant Bosco that he had 30 to 35 firearms "along the lines of AKs, MAC-10s, ARs, and several pistols" underneath his mattress in

---

[3] Fredrick is a truck driver who was out of the area at the time he was advised of a possible burglary. N.T. Suppression Hearing, 6/25/18, at 50-53. Fredrick was also on notice that he would be arrested for trespass if he returned to the property from which he was evicted. *Id.* at 40, 59.

- 2 -

the middle bedroom inside the mobile home. *Id.* at 34-36. Fredrick described where the weapons should have been located "several different times," insisting that they would be nowhere else. *Id.* at 52. Both Sergeant Bosco and Fredrick testified that Fredrick was highly concerned about the weapons being used to harm innocent people, which compelled Fredrick to request a police investigation of the suspected burglary. *Id.* at 36, 59-62.

Sergeant Bosco explained to Walters that Fredrick had summoned him to the property to investigate whether a burglary occurred and verify whether any firearms were missing from the trailer. *Id.* at 14-15, 35. After Walters explained the situation to her supervisor, she called Raymond Snyder, a YCM maintenance worker, to let Sergeant Bosco into the mobile home through the front door. *Id.* at 15. As they waited for Snyder to arrive, a neighbor informed Sergeant Bosco that she sees "people keep going up to [Fredrick's home]." *Id.* at 44. Sergeant Bosco testified that, from the front of the mobile home, "it appear[ed] [that] at some point[,] someone had messed around with the front window," and around the rear, the doorknob, which was falling off, looked as if someone "had [made] some attempts to force their way in." *Id.* at 36-37. Based on all of the foregoing, Sergeant Bosco believed that someone could have been inside the mobile home. *Id.* at 37.

Upon entering the mobile home, Sergeant Bosco conducted a protective sweep to ensure that no one else was inside. *Id.* at 37. Sergeant Bosco then entered the middle bedroom, where he immediately observed two rifle cases on top of a pile of clothing. *Id.* Inside the cases were a 12-gauge shotgun

and a Mossberg hunting rifle. *Id.* at 35-45. Sergeant Bosco checked under the mattress to see whether any of the 30-35 firearms that Fredrick described to him were missing. *Id.* at 38. The only weapons under the mattress were "a couple [of] BB guns." *Id.* at 38. During a follow-up phone call, Sergeant Bosco explained this to Fredrick, who advised him that this should not have been the case. *Id.* at 38. Fredrick further advised Sergeant Bosco on this call that he was a person prohibited from possessing firearms, and that "[h]e was more concerned about the weapons getting on the streets[,] because of what types they were," than he was concerned about "being in trouble for it." *Id.* at 38. Another officer ran a criminal background check on Fredrick and confirmed that he is a person not to possess firearms. *Id.* at 38-39.

The following day, Sergeant Bosco spoke with Fredrick via telephone to try to track down the missing guns. *Id.* at 39. Fredrick explained that none of the firearms was registered in his name. *Id.* at 39. Fredrick purchased the firearms on the streets of New York and New Jersey, and some of them had their serial numbers erased. *Id.* at 39. Police were unable to locate and recover any of the missing firearms. *Id.*

On April 3, 2018, Fredrick was charged with persons not to possess firearms in connection with the two weapons recovered from his mobile home. On June 25, 2018, the trial court held a suppression hearing and denied Fredrick's motion to suppress the evidence of the firearms, wherein Fredrick argued that Sergeant Bosco effectuated an illegal, warrantless search of his mobile home without his consent. *See id.* at 79. Fredrick proceeded to a

- 4 -

bench trial on January 9, 2019, before the Honorable Maria Musti Cook, after which he was convicted of the crime charged. On April 5, 2019, the court sentenced Fredrick to a term of three to six years' imprisonment.

Fredrick timely filed a notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Fredrick contests the trial court's denial of his pre-trial motion to suppress. Specifically, Fredrick argues that Sergeant Bosco lacked legal authorization to enter and search his locked mobile home without a warrant and without his express permission, and that the suppression court thus erred in failing to suppress the firearms found therein.

Our review of the suppression court's ruling on a motion to suppress is governed by the following principles:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the [Commonwealth] prevailed in the suppression court, we may consider only the evidence of the [Commonwealth] and so much of the evidence for the [defense] as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Cartagena***, 63 A.3d 294, 298 (Pa. Super. 2013) (en banc) (citation omitted).

- 5 -

In the matter *sub judice*, the suppression court concluded that Fredrick impliedly consented to police entry into his mobile home by summoning police to investigate a suspected crime against him, telling Sergeant Bosco about the weapons inside voluntarily, and communicating the idea that public safety was in grave jeopardy. Trial Court Opinion, 8/22/19, at 7. We agree.

Under both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, a search conducted without a warrant is deemed to be unreasonable, and therefore, constitutionally impermissible, unless an established exception applies. **Commonwealth v. Kemp**, 961 A.2d 1247, 1260 (Pa. Super. 2008). "One such exception is consent, voluntarily given." **Id.** Consent may be express or implied. **See Commonwealth v. Witman**, 750 A.2d 327 (Pa. Super. 2000); **Commonwealth v. Wilmer**, 194 A.3d 564, 573-76 (Pa. 2018) ("the Superior Court in **Witman** . . . approved [police] entry [into defendant's residence] based upon the initial *implied consent* of [the defendant,] and thereafter [approved reentry into his residence] based upon the *express consent* of his mother and father.") (emphasis added).

In **Commonwealth v. Smith**, 77 A.3d 562, 568-69 (Pa. 2013), our Supreme Court explained:

> [T]he legality and constitutionality of warrantless, but consented[-]to searches and seizures are examined objectively under a totality of the circumstances test to determine whether the consent was the product of an essentially free and unconstrained choice and not the result of coercion or duress. Under this maxim, no one fact, circumstance, or element of the examination of a person's consent has talismanic significance.

. . . [I]t is a court's function to determine whether a criminal defendant voluntarily and knowingly gave his consent to be subjected to a search or seizure as contemplated by the Fourth Amendment and Article I, Section 8.

*Id.* (citations and quotation marks omitted).

With regard to consent, "voluntariness" is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Moreover, the standard for measuring the scope of an individual's consent is one of "objective reasonableness." *Commonwealth v. Reid*, 811 A.2d 530, 549 (Pa. 2002). Thus, we ascertain the scope of consent based on what "a reasonable person would have understood by the exchange between the officer and the person who gave the consent." *Id.*

In *Witman*, *supra*, this Court first addressed the issue of implied consent to search and held, after examining the law of our sister states,[4] that "a sound exception to the warrant requirement must exist where a defendant has summoned police and set the tone for the initial investigation." *Id.* at 335. There, the defendant called police to his home after claiming to have

---

[4] *See, e.g., Brown v. Texas*, 856 S.W.2d 177 (Tex. Crim. App. 1993) (where owner of premises reports to police that third person committed crime, owner implicitly consents to search of premises reasonably related to routine investigation of offense and identity of perpetrator); *State v. Fleishman*, 754 P.2d 340 (Ariz. Ct. App. 1988) (restaurant owner who was not criminal suspect implicitly consented to search of restaurant by reporting wife's killing to police); *State v. Fredette*, 411 A.2d 65 (Me. 1979) (defendant consented to search of home by calling police, reporting husband shot, and cooperating during police search); *Kelly v. State*, 249 N.W.2d 800 (Wis. 1977) (defendant consented to search of premises by reporting to police deceased was shot while defendant was in another room).

heard a struggle downstairs and finding his brother slain. *Id.* at 335. The Court noted that because the defendant presented himself to police as a victim, and the police did not suspect him as the perpetrator of any crime, "the record support[ed] a finding that police [were] conducting an investigation pursuant to the [defendant's] valid consent." *Id.* at 331-37. Furthermore, we specifically held in *Witman* that "in summoning emergency personnel for help and by communicating the idea that a murderer was at large, [the defendant] implicitly consented to the police entry into the house." *Id.* at 335.

Here, Fredrick called the police to alert them to the possibility that a large cache of firearms had been stolen from his mobile home and turned loose on the streets. Fredrick informed Sergeant Bosco that he had no way of verifying whether his trailer had been burglarized or whether the firearms were secure. He repeatedly told Sergeant Bosco that the firearms should have been located under the mattress in the middle bedroom, and he repeatedly expressed fears that the weapons would be used to harm innocent people. At the time Fredrick initially contacted the police, he represented himself as a victim, and the police had no reason to suspect that he was involved in any criminal activity. Thus, we find that the police acted pursuant to his valid consent. *See Witman*, *supra* at 331-37.

Regarding the scope of Fredrick's consent, we find that, undoubtedly, "a reasonable person would have understood" that Fredrick requested police assistance in safeguarding the firearms under his mattress, which necessarily

- 8 -

entailed entry into his mobile home and, specifically, his bedroom. **See Reid**, **supra**. Tellingly, when Sergeant Bosco called Fredrick to report that the guns were missing, Fredrick did not object to Sergeant Bosco's presence inside the mobile home; instead, Fredrick continued to cooperate with Sergeant Bosco and, unprompted, revealed to Sergeant Bosco that he was a person not to possess firearms. There is nothing in the record to suggest that Fredrick's implied consent for Sergeant Bosco to enter his home and verify whether his firearms were stolen was the result of anything other than Fredrick's unfettered free will and his justifiable concern for the safety of others.

Given the foregoing, we conclude that the warrantless search of Fredrick's mobile home was constitutionally permissible. **Witman**, **supra**. Specifically, Fredrick impliedly and voluntarily consented to Sergeant Bosco's search of his mobile home by summoning police to investigate a suspected burglary against him, repeatedly telling Sergeant Bosco where his arsenal should have been located inside the home, and communicating the idea that without police intervention, dozens of extremely dangerous firearms might be put to nefarious use. **See id.**

Accordingly, all evidence seized inside Fredrick's mobile home was admissible at trial. The suppression court did not err in denying Fredrick's pre-trial motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/31/2020